IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JAMES A. SHREVE and NANCY          :
SHREVE,                            :
     Plaintiffs                    :
                                :
           v.                        :     Civil No. AMD 00-2162
                                :
SEARS, ROEBUCK & COMPANY           :
and MURRAY, INC.,                  :
     Defendants                    :

...oOo...

**MEMORANDUM**

Contents

FILED _____ ENTERED
_____ LODGED _____ RECEIVED

SEP 2 5 2001

A1 BALTIMORE
CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____ DEPUTY

I.     INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -3-

II.    FACTS AND PROCEDURAL HISTORY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -4-

III.   DR. JOSEPH SHELLY IS NOT A QUALIFIED EXPERT UNDER THE
      CIRCUMSTANCES OF THIS CASE, AND HIS OPINION TESTIMONY IS NOT
      ADMISSIBLE BECAUSE HIS OPINIONS WERE NOT RELIABLY DERIVED
      FROM SOUND SCIENTIFIC OR ENGINEERING METHODOLOGIES; NO
      SUCH INFIRMITIES APPLY TO THE DEFENDANTS' EXPERTS . . . . . -12-
          A.    Dr. Shelly Lacks Relevant Qualifications Under the Circumstances of
              this Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -13-
          B.    Although Dr. Shelly Has Identified Valid Scientific/Technical
              Methodologies and Has Applied Appropriate Labels to his Analytical
              Protocol, He Failed to Employ those Methodologies in a Scientifically
              or Technically Valid Manner and Has Therefore Failed to Derive
              Reliable and Valid Engineering Conclusions . . . . . . . . . . . . . . -19-
              1.    Dr. Shelly's Causation Opinions Do Not Reliably Arise From
                   His Fault Tree Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . -21-
              2.    Dr. Shelly's Opinions As To The Discharge Chute Do Not
                   Reliably Arise From A Valid "Risk Utility Analysis"   -30-
              3.    Dr. Shelly's Opinions About Adequacy of Warnings Are Not
                   Admissible . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -34-
          C.    Defendants' Experts Are Qualified and to the Extent Their Opinions
              May Be Relevant, They Are Admissible . . . . . . . . . . . . . . . . . . -35-

IV.    DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW AS
       TO ALL THEORIES EXCEPT STRICT LIABILITY BASED ON DESIGN
       DEFECT AND IMPLIED WARRANTY OF MERCHANTABILITY; PLAINTIFFS
       ARE NOT ENTITLED TO SUMMARY JUDGMENT AS TO ANY
       THEORY .................................................... -39-
       A.    Summary Judgment Standards ........................... -40-
       B.    Strict Liability Claims ................................ -42-
             1.    Manufacturing Defect Claim ...................... -50-
             2.    Failure to Warn Claim ........................... -54-
             3.    Design Defect Claim ............................. -58-
       C.    Maryland Consumer Protection Act Claim ................. -61-
       D.    Breach of Warranty Claims ............................ -68-
             1.    Express Warranty Claim .......................... -68-
             2.    Implied Warranty of Merchantability Claim .......... -72-
       E.    Loss of Consortium .................................. -73-

V.     MOTION TO AMEND AND RELATED MOTIONS ................... -73-

VI.    CONCLUSION ............................................... -77-

This is a personal injury damages action based on Maryland products liability law.

It is a unique case in that the claims arise out an alleged defect which disabled the very

safety apparatus-- a form of "dead man" lever-- that was designed into the product-- a snow

thrower-- as a result, in part, of prior products liability claims. The particular alleged failure

of the safety feature had never been reported in a prior accident and the alleged failure never

has been replicated, in either a controlled experiment or in the ordinary use of any snow

thrower. "[S]ometimes truth is stranger than fiction."[1] It will fall to the jury to determine

---

[1]*Arnstein v. Porter*, 154 F.2d 464, 469 (2d Cir. 1946); *see Denton v. Hernandez*, 504 U.S. 25, 33 (1992)("[S]trange, but true; for truth is always strange, Stranger than fiction." (internal quotations omitted)(quoting Lord Byron, *Don Juan*, canto XIV, stanza 101(T. Steffan, E. Steffan (continued...)

whether that venerable maxim applies in this case.

I.    INTRODUCTION

The case is here on the basis of diversity of citizenship jurisdiction; it was instituted by James and Nancy Shreve in state court and timely removed by defendants. The Shreves seek damages for injuries James Shreve (hereinafter "Shreve") suffered while he used a Craftsman brand snow thrower, and for loss of consortium. Defendants are Sears, Roebuck and Company, from whom Shreve purchased the snow thrower, and Murray, Inc., the manufacturer of the snow thrower. Discovery has concluded and now pending are the following motions: (1) defendants' motion to exclude the testimony of the Shreves' expert witness; (2) the Shreves' reciprocal motion to exclude the testimony of the defendants' experts; (3) the parties' cross-motions for summary judgment; (4) the Shreves' motion to file a second amended complaint (and certain discovery-related motions arising therefrom); and (5) the Shreves' motions to compel.

The motions have been fully briefed and a hearing has been held, during which I examined the snow thrower with counsel. For the reasons set forth in Part III below, defendants' motion to exclude the testimony of the Shreves' expert shall be granted; the Shreves' reciprocal motion to exclude the testimony of the defendants' experts shall be denied. In Part IV below, I explain why defendants' motion for summary judgment shall be

---

[1](...continued)
& W. Pratt eds. 1977))).

granted in part and denied in part, and the Shreves' motion for summary judgment denied. In the circumstances of this case, as defendants largely concede, even without their expert witness, the plaintiffs may nonetheless present their strict liability design defect claim, as well as their implied warranty claim, to the jury. In Part V below, I explain why I shall deny plaintiffs' motion to amend and the discovery motions, including the motions to compel.

II.    FACTS AND PROCEDURAL HISTORY

Shreve is 56 years old and has been employed as a carpentry foreman for 32 years. He is right-handed. He has continued to work as a carpentry foreman since the events at issue in this case on the same terms as prior to the accident, but he experiences trouble completing carpentry tasks and other tasks of daily life.

On September 20, 1997, Shreve purchased a Craftsman brand snow thrower from Sears at a store in Baltimore County. The snow thrower was manufactured by Murray. The snow thrower is a walk behind, self propelled snow thrower with an eight horsepower gasoline engine. It is equipped with an electric/recoil start system, six forward and two reverse speeds controlled by a speed shift lever, and a throttle to control fuel feed.

The snow thrower is designed to remove snow from ground surfaces. It has a wide, rotating screw auger at the front that is geared to high speed rotating impeller blades. As the snow thrower is advanced into accumulated snow, the auger gathers the snow and forces it into the impeller blade chamber. The four impeller blades then capture the snow and thrust it out a vertical discharge chute. This chute has an adjustable deflector plate, and the entire

-4-

discharge chute can be adjusted so that snow can be thrown to either side of the machine. The motor will not turn on unless the ignition key is in place.

The output shaft of the engine is fitted with two belt pulleys. One belt drives the road wheels. The second belt drives a shaft on which is mounted the impeller and a gear that drives the auger. The snow thrower is equipped with continuous activation engagement controls for both the traction and auger/impeller drives (hereinafter "dead man" controls or levers). Power to both of these mechanical drives is interrupted when the operator releases the "dead man" controls. A braking mechanism is also applied to the auger/impeller when the auger/impeller control is released. These levers are spring mounted on the handle bar of the snow thrower and are designed to be depressed when the person operating the machine is in the safest position for operation. In the idling position, the belt between the pulleys is slack and so is not turned by the drive pulley. When the "dead man" levers are depressed, they engage the idler pulley against the drive belt, which tightens the belt and causes it to have traction against the drive pulley and to turn. The lever on the left hand side of the handle bar controls the machine's traction drive. The lever on the right hand side controls the auger drive.

The auger and impeller blades grind the snow, and the impeller blades force the snow up through the discharge chute, expelling the snow from the machine. The discharge chute is located above the impeller blades and, as mentioned above, it can be adjusted to point either to the left or to the right, depending on the direction in which the operator wants to

expel the snow. The chute is spherical and approximately six to ten inches in diameter. It is not fully enclosed but is open on one side. At the time it was manufactured and at the time Shreve purchased it, the snow thrower conformed to all applicable industry standards (and it so conforms today).

Shreve purchased the snow thrower for home use. He had not previously owned or used a snow thrower. The snow thrower came fully assembled. It was accompanied by an Owner's Operating Manual.[2] Before he used the snow thrower, Shreve read the Owner's Manual, and he understood its contents. The Manual contained warnings not to make any adjustments to the snow thrower when the motor is running and to stop the motor whenever leaving the operator's position or when unclogging the auger or the impeller. The snow thrower also has a decal on the machine warning that the engine should be turned off before attempting to unclog the discharge chute. A second decal warns the operator to read the Owner's Manual before using the machine and that the engine should be turned off prior to unclogging the chute or leaving the machine for any reason. Shreve read and understood the warning decals on the machine. Shreve understood how the machine functioned, as he regularly operated power equipment at his carpentry foreman job.

Shreve used the snow thrower approximately two or three times prior to March 9, 1999. His son, Michael Shreve, also used it once. Shreve did not use the snow thrower during the winter of 1997-98. Shreve claims that his son told him that when his son used the

---

[2]The manual is 63 pages, of which 26 pages are printed in Spanish.

snow thrower, he had had difficulty getting the machine out of reverse and that it "looked like ice or something had built up on the throttle at the bottom of it." Shreve Dep. at 19. Shreve took no action in response to this problem, and he never reported experiencing it or witnessing it himself. Shreve experienced no problems with the machine, which was not altered or repaired at any time after he purchased it.

The snow thrower was always stored in a shed behind the Shreves' home, which is located at the southwest corner of Linda Drive and Ingleside Avenue in Catonsville, Maryland. Linda Drive runs east/west; it slopes upwards as it goes east. Ingleside runs north/south.

Shreve testified on deposition on October 3, 2000, and described the accident, to which there were no eyewitnesses. Shreve testified that he began using the snow thrower at about 3:00 p.m. on March 9, 1999, after returning home from work. It had been snowing all day and was still snowing when he began. Approximately five inches of snow had already accumulated on the ground. Shreve first used the snow thrower to clear the sidewalk on Linda Drive, clearing approximately 200 to 300 feet. Shreve Dep. at 36. He cleared the sidewalk going east and up the slope of Linda Drive towards Ingleside. Shreve Dep. at 36. After clearing the sidewalk, Shreve placed the snow thrower in the street, next to the curb on Linda Drive. The front of the machine was facing west down Linda Drive. He was going to next clear portions of Linda Drive. The discharge chute was pointing towards the street.

Shreve decided to get his gloves because his hands were cold. His gloves were in his

-7-

pickup truck, which was parked on Linda Drive, about 30 feet west from where he left the snow thrower. Shreve did not turn off the motor when he walked away from the thrower to get his gloves from his truck. Shreve Dep. at 38. When he left the machine, he necessarily released the auger/impeller drive and traction drive "dead man" levers. Shreve Dep. at 51. Shreve retrieved his gloves and then walked up the slope of Linda Drive east towards the snow thrower. He was walking in the street. As he got near the machine, Shreve lost his balance and began to fall. As he fell, his right hand went into the chute deflector of the snow thrower. Shreve Dep. at 41. His right hand came into contact with the rotating impeller blades, resulting in the loss of parts of the three middle fingers on his right hand. Shreve does not remember whether he saw the auger blades rotating as he was walking up the street towards the machine or when he was falling. Shreve Dep. at 45. He believed that they were not rotating when he was walking towards the machine because he had released the "dead man" lever. Shreve Dep. at 52. Shreve remembered losing his balance, falling, and putting his hands out to catch himself. Shreve Dep. at 50. He did not remember hitting the ground or that any other portion of his body, besides his right hand, touched any part of the snow thrower. Shreve Dep. at 50.

In connection with the summary judgment motions, Shreve submitted an affidavit with significantly more detailed information about the accident and its potential causes. In this affidavit, Shreve stated that he did not depress the auger/impeller "dead man" lever with his left hand or with any other part of his body as he was falling. Shreve Affidavit ¶7. He

-8-

stated that the impeller was rotating when his arm went into the chute. *Id.* Shreve's middle three fingers were amputated by the blades and his pinky finger was injured and required a tissue graft and short arm cast.

The Shreves retained Dr. Joseph Shelley as an expert witness. On September 5, 2000, Dr. Shelley submitted his "Engineering Analysis of the Safety Guarding on the Craftsman Model Number 536.886180 Snow Thrower in the Injury Incident Involving James A. Shreve." In describing the incident, this report located Shreve on the sidewalk of one of the streets adjacent to his house (not in the street), with the snow thrower in the street with its auger blades facing him as he approached it from his truck and the discharge chute pointing toward the sidewalk. Dr. Shelly's report concludes that "more likely than not" the accident was caused by a design defect whereby water accumulated in the groove in the underside of the driven pulley, which controlled the "dead man" levers, and froze, thereby forming ice and preventing the levers from disengaging the auger/impeller blades. Thus, according to Dr. Shelly, when Shreve lost his footing and fell next to the snow thrower and his right hand went into the discharge chute, the impeller blades "had some rotational motion inside the impeller chamber" and severed his fingers. Sept. 5, 2000 Report at 16. Dr. Shelley stated that the driven pulley of the auger/impeller belt drive "shows a heavily rusted condition. It may be concluded from this appearance that the pulley had been operated in a wet environment. Such a pulley surface condition would be consistent with melted snow water running on to, and over, this pulley." *Id.* at 20.

-9-

The Shelly report also concludes that the lack of "adequate guarding of the shear points of the impeller blade tip edges, in the form of an enclosing tube directly above the impeller housing, is a critically serious design defect." *Id.* at 17. He opined that

> [a] diverging, fully enclosed extension tube should have been provided above the exit opening from the impeller blade chamber. Such an enclosed discharge duct would have virtually no effect on the throwing of snow through it, and it would have provided an order-of-magnitude increase in protection from injury due to inadvertent contact with the moving impeller blades. The technology for the design, and fabrication, of such an enclosed chute was well known, and widely available, at the time of manufacture of the snow thrower.

*Id.* The Shelly report identifies three other "serious design defects:" "[1] The lack of any safety warnings in the manual on the danger of losing one's footing near the snow thrower, and making inadvertent contact with the exposed impeller blades; [2] The lack of any reference in the trouble shooting section of the manual to the problem of failure to obtain complete clutch disengagement when the [dead man] levers are released; [and 3] The lack of any safety warning labels on the snow thrower describing the danger of losing one's footing near the snow thrower and making inadvertent contact with the exposed impeller blades." *Id.* at 18, 19 (deletions omitted).

On September 16, 2000, Dr. Shelley submitted his first supplementary report, in which he disclosed that the U.S. Weather Service Meteorological/Climatological weather record for nearby Anne Arundel County for the date of the accident indicated that five inches of a mixture of snow, ice pellets, and ice had fallen. Also, the air temperature that day ranged from 24 to 28 degrees Fahrenheit. Shreve Opp. Ex F.

Defense experts Raymond Elmy and David Sassaman submitted reports dated November 1, 2000, and October 16, 2000, respectively.[3] Those reports state the following obvious conclusion: had Shreve followed the operating manual safety rules and turned off the motor while leaving it unattended to retrieve his gloves, Shreve would not have sustained injury. Sassaman Report at 10: Elmy Report at 6. They each also conclude that Dr. Shelley's theory of ice build-up in the groove in the driven pulley has never been documented by anyone and that such an occurrence is impossible.

Sassaman's report states that "in the entire history of this machine, along with all expert testing, there has not been a single report of the operator presence control failing to stop the auger/impeller." *Id.* His report concludes that given the nature of Shreve's injury, it "[must have] occurred while the mechanism was under full power and not idling or free wheeling." *Id.* at 10. Moreover, Sassaman stated that Dr. Shelley's idea that an enclosed flared discharge chute would improve safety was misguided because it would promote chute clogs and be more dangerous. *Id.* at 11. He reported that his inspection of Shreve's snow thrower did not reveal evidence of a leak path for snow melt to reach the pulley, and that in any event the belt pulley system of the machine generates heat that would prevent any water from freezing. Thus, he offered the opinion that "it is not possible for water to accumulate and freeze in the lower pulley and cause a malfunction of the auger/impeller clutch/brake

---

[3]On deposition, Elmy testified that he has participated in the testing of many snow throwers under numerous snowy conditions, though not the exact conditions present during Shreve's accident. Sassaman testified that he had never participated in the testing of Shreve's snow thrower in snowy conditions, or of any similar snow thrower.

mechanism in this machine." *Id.* at 12.

Dr. Shelley reviewed the defense expert reports and submitted a second supplemental report on or about November 18, 2000. He responded to their reports point by point. He reiterated that it was a design defect not to include an enclosed discharge chute, even though no snow thrower manufacturer used that design. Shreve Opp. Ex G.

The deadline for submitting Rule 26(e)(2) supplemental expert disclosures was November 30, 2000. In a December 6, 2000, letter, Dr. Shelley reported that he had researched industry practice concerning discharge chutes on snow throwers and that he had found three models of Toro brand snow throwers that used an "m wire" guard across the discharge chute opening. The letter concluded that "[t]he use of a formed wire chute guard would have been a viable alternative to use of an enclosed, flaring discharge chute." Shreve Opp. Ex. H.

III.    DR. JOSEPH SHELLY IS NOT A QUALIFIED EXPERT UNDER THE
        CIRCUMSTANCES OF THIS CASE, AND HIS OPINION TESTIMONY IS NOT
        ADMISSIBLE BECAUSE HIS OPINIONS WERE NOT RELIABLY DERIVED
        FROM SOUND SCIENTIFIC OR ENGINEERING  METHODOLOGIES; NO
        SUCH INFIRMITIES APPLY TO THE DEFENDANTS' EXPERTS

I shall first consider the cross-motions to exclude expert witness testimony, each side seeking to exclude the experts of the other.

As amended effective December 1, 2000, Rule 702 of the Federal Rules of Evidence states:

> If scientific, technical, or other specialized knowledge will assist the trier of
> fact to understand the evidence or to determine a fact in issue, a witness

> qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The "basic gatekeeping obligation" previously identified by the Supreme Court in *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U. S. 579 (1993), and now embraced by Rule 702 applies not only to "scientific" testimony, but to all expert testimony. *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 147 (1999).[4] Indeed, as the Supreme Court has explained, "no clear line" divides "'scientific' knowledge and 'technical' or 'other specialized' knowledge. Disciplines such as engineering rest upon scientific knowledge." *Id.* at 148.

The gatekeeping function, like other determinations of admissibility of evidence, requires the trial judge to exercise an informed and broad discretion. *Cooper v. Smith & Nephew, Inc.,* 259 F.3d 194, 199-200 (4th Cir. 2001); *Oglesby v. General Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999); *cf.* F. R. E.104(a). Two aspects of this determination are pertinent to the case at bar: whether the expert is qualified, and if so, whether the opinion he proffers is reliable. *See Kumho Tire*, 526 U.S. at 150, 153. I am constrained to conclude that, as to Dr. Joseph Shelly, the answer to each of these inquiries is "no."

    A.    Dr. Shelly Lacks Relevant Qualifications Under the Circumstances of this Case

"[T]here are many different kinds of experts, and many different kinds of expertise."

---

[4]"Effective December 1, 2000, Rule 702 was amended to reflect the Supreme Court's recent decisions in *Daubert* and *Kumho Tire Co. v. Carmichael* . . . ." *Cooper v. Smith & Nephew, Inc.,* 259 F.3d 194, 199 n. 1 (4th Cir. 2001).

*Kumho Tire*, 526 U.S. at 150. The fact that a proposed witness is an expert in one area, does not *ipso facto* qualify him to testify as an expert in all related areas. *See, e.g., Oglesby,* 190 F.3d at 247; *Wilson v. Woods,* 163 F.3d 935, 938 (5th Cir. 1999); *Ancho v. Pentek Corp.,* 157 F.3d 512, 517 (7th Cir. 1998); *Bogosian v. Mercedes-Benz of North America,* 104 F.3d 472, 476 (1st Cir. 1997); *Trumps v. Toastmaster, Inc.,* 969 F. Supp 247, 252 (S.D.N.Y. 1997); *Silva v. American Airlines, Inc.,* 960 F. Supp. 528, 531 (D. P.R. 1997); *Diviero v. Uniroyal Goodrich Tire Co.,* 919 F.Supp. 1353, 1356-57 (D. Ariz. 1996), *aff'd,* 114 F.3d 851 (9th Cir. 1997).[5]

More specifically, an expert who is a mechanical engineer is not necessarily qualified to testify as an expert on any issue within the vast field of mechanical engineering. Unless he is to testify only to general engineering principles that any mechanical engineer would know, the engineer must possess "some special skill, knowledge or experience," *Ancho,* 157 F.3d at 517, concerning the particular issue before the court. *Compare Oglesby,* 190 F.3d at 247 (testimony excluded of well-qualified mechanical engineer with no specialized

---

[5]Several pre-*Daubert* cases confirm that this approach is not new. *See, e.g., Tokio Marine & Fire Ins. Co,* 958 F.2d 1169, 1174-75 (1st Cir. 1992) (civil engineer, who had investigated over 60 crane accidents, not admitted as expert on how hydraulic cranes work and are operated, crane design, crane manufacturing and marketing, or load moment indicators); *Sullivan v. Rowan Companies, Inc.,* 952 F.2d 141, 146 n.9 (5th Cir. 1992) (expert in mechanical engineering not allowed to testify that metal of socket that exploded was hydrogen embrittled because opinion required metallurgist—a field outside the realm of mechanical engineering); *Stull v. Fuqua Indus., Inc.,* 906 F.2d 1271, 1275 (8th Cir. 1990) (mechanical engineer could not testify that human foot would have been broken had lawn mower upturned as plaintiff claimed because witness was not expert on human anatomy); *see also Mannino v. Int'l Mfg. Co.,* 650 F.2d 846, 850 (6th Cir. 1981)("[T]he trial judge should not rely on labels, but must investigate the competence a particular proffered [expert] witness would bring to bear on the issues.").

experience or expertise in evaluating either automobile manufacturing processes or the strength of plastic automobile component parts); *Wilson,* 163 F.3d at 938 (recognized expert on causes of fires excluded as expert on motor vehicle collision accident reconstruction); *Ancho*, 157 F.3d at 517 (mechanical engineer with no experience designing or evaluating factories not an expert on industrial plant configuration); *Bogosian*, 104 F.3d at 477 (well qualified master auto mechanic was not qualified as expert on car design absent relevant experience or knowledge); *Trumps*, 969 F. Supp at 252 (board certified safety professional and mechanical engineer not qualified to offer expert testimony regarding malfunction of electric grill; electrical engineering outside expert's field); *Silva*, 960 F. Supp. at 531(civil engineer with public works experience could not testify about safety aspects of aircraft design about which he had no professional experience); *Diviero*, 919 F.Supp. at 1356-57 (engineer with over 30 years experience working with bias belted tires not qualified to testify that steel belted tire was unreasonably dangerous because two tires significantly different and he lacked chemical background to gauge compatibility of steel and rubber interface in tire), *with Wheeler v. John Deere* Co., 935 F.2d 1090, 1100 (10th Cir. 1991) (mechanical engineer with special expertise in safe design of farm equipment could testify that combine was dangerous beyond the expectation of the ordinary consumer because inherent in design of safety mechanisms is anticipation of how such equipment will be perceived and used by consumers); *Williams v. Pro-Tec, Inc.*, 908 F.2d 345, 348 (8th Cir. 1990)(mechanical engineer who had conducted tests to determine the amount of force with which a racquetball

could strike the human eye when the ball was shot at various speeds at a person wearing the Pro-Tec eyeguard could testify that the eye guard would slow the ball and was not unreasonably dangerous despite lack of expertise in ophthalmology); *Lavespere v. Niagra Machine & Tool Works, Inc.*, 910 F.2d 167, 176 (5th Cir. 1990) (professor of mechanical and production engineering allowed to testify about designing point-of-operation safeguards for press brake industry though he had never designed a press brake or safeguards for that device because he had practical experience designing similar devices, was a recognized expert on similar devices and he had conducted a review of the relevant literature), *cert. denied*, 510 U.S. 859 (1993), *abrogated in part on other grounds, Little v. Liquid Air Corp.*, 37 F.3d 1069 (5th Cir. 1994).

While the fit between an expert's specialized knowledge and experience and the issues before the court need not be exact, *see Wheeler*, 935 F.2d at 1101 (lack of perfect fit will go to the weight not the admissibility of expert testimony), an expert's opinion is helpful to the trier of fact, and therefore relevant under Rule 702, "only to the extent the expert draws on some special skill, knowledge or experience to formulate that opinion; the opinion must be an expert opinion (that is, an opinion informed by the witness' expertise) rather than simply an opinion broached by a purported expert." *Ancho*, 157 F.3d at 518 (internal quotations omitted)(quoting *United States v. Benson*, 941 F.2d 598, 604 (7th Cir. 1991). As *Daubert* and *Kumho Tire* make clear, "the [trial court's] gatekeeping inquiry must [therefore] be 'tied to the facts' [and issues] of the particular 'case.'" *Kumho Tire*, 526 U.S.

-16-

at 150 (*quoting Daubert*, 509 U.S. at 591).

Applying the above principles to the case at hand, I conclude that while Dr. Shelley is an expert as to many things, he does not qualify as an expert on the safe design and operation of snow throwers. The Shreves seek to have Dr. Shelley testify as an expert to "two primary opinions in this litigation:"

> First, Dr. Shelley opined that the origin of one product defect at issue was a design that allows the freezing, and building-up, of melted snow in the Snow Thrower's auger/impeller driven pulley groove (thus increasing the effective diameter of that pulley groove) . . . . Dr. Shelley's second primary opinion is that the Snow Thrower suffered a design defect by not having a component to guard or shield the opening above the impeller blade that amputated Mr. Shreve's finger (whether that component be a "flared chute," or the conceptually identical m-wire (such as the Toro M-wire)).

Shreve Opp. to Defs'. Mot. to Exc. p.3 n.4. Dr. Shelley also offered an opinion that the subject snow thrower's warnings were inadequate and what adequate warnings for this product would be.

Dr. Shelley is an eminently qualified mechanical engineer and professor of mechanical engineering whose courses include Machine Design and Mechanical System Failure Analysis.[6] Aside from testifying as an expert (*see infra* note 7), however, he has had no professional experience with respect to the design, manufacture, operation, or safety of

---

[6]Dr. Shelley has authored several textbooks on engineering mechanics, both statics and dynamics. He has also authored texts on vector mechanics and is in the process of writing a book titled, "Machine Design." He testified, however, that the "machine design text . . . is going so slowly that I may never live to see it finished." Shelley Dep. at 29. He has extensive consulting and full time employment experience analyzing complex weapons systems, including turbojets.

outdoor power equipment, including snow throwers. Dr. Shelley did not conduct a review of the literature on snow throwers. He has never been involved with any industry or governmental body charged with the responsibility of developing or overseeing safety standards for snow throwers or any similar device. He has never owned and, outside the context of litigation, has never operated a snow thrower. His sole exposure to the specific type of snow thrower at issue in this case is the hour and one-half that he spent on August 8, 2000, at the Shreves' residence. On that occasion, he operated the snow thrower for three minutes in summer conditions. But for three litigation matters, including this one, he would never have laid a hand on a snow thrower.[7]

Dr. Shelley is clearly an experienced expert witness. His resume lists close to 200 "product liability" reports he authored as of December 1998. In these reports, he analyzed the design and alleged defects of products that caused accidents as varied as ladders and step stools, trucks, saws, lawn mowers, staplers, chaise lounges, folding chairs, bulk mail sorters, packaging machines, walkers, clothes hooks, exercise machines, stone crushers, debris chippers, presses, dough slicing machines, concrete mixing trucks, and more. He has even prepared two other reports concerning injuries caused by snow throwers. *See supra* note 7. But one does not necessarily become an expert on a topic simply by testifying about it in

---

[7]Including the present case, Dr. Shelley has been retained on three occasions by plaintiffs pursuing personal injury claims against the manufacturer or seller of a snow thrower. In the first case, filed in New Jersey, he issued a report in February 1993 and testified at the trial. Shelley Dep. at 35-39. In the second case, in 1993, Dr. Shelley inspected a snow thrower and took and forwarded photographs of the snow thrower to the attorney for the claimant. *Id.* at 39-42. He performed no other services in that case. *Id.* at 42.

court. "Although [Dr. Shelly's] background might permit him to learn faster than others about the design and safety aspects of [snow throwers], an expert must have specific knowledge, not mere capacity to acquire knowledge." *Silva*, 960 F. Supp. at 531. In my judgment, Dr. Shelley offers his opinions concerning the Murray snow thrower at issue in this case as a classic "hired gun," with no particular expertise concerning snow throwers.[8]

B.    Although Dr. Shelly Has Identified Valid Scientific/Technical Methodologies and Has Applied Appropriate Labels to his Analytical Protocol, He Failed to Employ those Methodologies in a Scientifically or Technically Valid Manner and Has Therefore Failed to Derive Reliable and Valid Engineering Conclusions

Even were I to deem Dr. Shelley to be qualified to offer expert opinion testimony concerning the design and operation of snow throwers, nevertheless, his particular implementation of the methodology he identified by which he arrived at his opinions lacks scientific or technological validity in the field of engineering; thus, he has fatally undermined the soundness of his methodology. Consequently, his opinions are unreliable and inadmissible. *See Kumho Tire*, 526 U.S. at 153 (determining that a well qualified mechanical engineer's testimony was properly excluded because his methodology was not scientifically or technologically valid).

Under Rule 702, "the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 589. In *Daubert*,

---

[8]"In all cases, however, the district court must ensure that it is dealing with an expert, not just a hired gun." *Tyus v. Urban Search Mgmt.*, 102 F.3d 256, 263 (7th Cir. 1996), *cert. denied*, 520 U. S. 1251 (1997).

the Supreme Court laid out five non-exhaustive factors that a court may consider in determining whether to admit an expert opinion as reliable, including:

–Whether a "theory or technique . . . can be (and has been) tested";
–Whether it "has been subjected to peer review and publication";
–Whether, in respect to a particular technique, there is a high "known or potential rate of error" and whether there are "standards controlling the technique's operation"; and
–Whether the theory or technique enjoys "general acceptance" within a "'relevant scientific community.'"

*Kumho Tire*, 526 U.S. at 149-150 (*quoting Daubert*, 509 U.S. 592-94). The *Daubert* factors "are meant to be helpful, not definitive," *id.* at 151, and "the court's evaluation is always a flexible one." *Oglesby*, 190 F.3d at 250. As the Supreme Court held in *Kumho Tire*, "[i]ndeed, those factors do not all necessarily apply even in every instance in which the reliability of scientific testimony is challenged." *Kumho Tire*, 526 U.S. at 149.

The inquiry underlying the *Daubert* factors involves not only whether the methodology that the expert used is generally accepted within the relevant scientific or professional community, but also whether it was reasonable for the expert to use that methodology to "draw a conclusion regarding the particular matter to which the expert testimony is directly relevant." *Id.* at 154. As the Fourth Circuit explained in *Oglesby*, "[a] reliable expert opinion must be based on scientific, technical or other specialized *knowledge* and not on belief or speculation, and inferences must be derived using scientific or other valid methods." 190 F.3d at 250 (emphasis in original)(*citing Daubert*, 509 U.S. at 592-93). "[T]o qualify as 'scientific knowledge,' an inference or assertion must be derived by the scientific method. Proposed testimony must be supported by appropriate validation-- i.e.,

'good grounds,' based on what is known." *Daubert*, 509 U.S. at 590. "Scientific

methodology today is based on generating hypotheses and testing them to see if they can be

falsified . . . . The statements constituting a scientific explanation must be capable of

empirical test." *Id.* at 593 (citations omitted).

        1.      Dr. Shelly's Causation Opinions Do Not Reliably Arise From His Fault
              Tree Analysis

Dr. Shelley purports to rely upon "fault tree analysis" to arrive at his opinion that

Shreve was injured as a result of water from melted snow invading the underside groove of

the driven pulley, freezing in the groove, and thereby causing the radius of the pulley to

expand.[9] The increased radius of the driven pulley caused the belt to remain taut (rather than

appropriately slack) when Shreve released the "dead man" lever, which in turn caused the

auger and impeller blades to continue rotating even when Shreve was not depressing the

"dead man" levers. Dr. Shelley testified that his visual inspection of the driven pulley shaft

revealed rust, indicating the presence of water. However, he never tested his hypothesis by

using Shreve's snow thrower (or any snow thrower) under climatic conditions similar to (or

_____

[9]During his deposition, Dr. Shelley explained that he employed a "fault tree analysis" in
forming his opinions:

    [W]hat one does in a situation like in a standard full tree analysis of this problem,
    or a risk utility study, is one considers the possible ways that a person can be
    injured in this product. And it could be a tree-year old walking by who slips and
    loses an arm. So, this is part of the engineering analysis. I don't need a handbook
    for this. Because part of engineering training is you look ahead and you anticipate
    what will happen. So, on the basis of that, I arrived at this very considered
    professional opinion.

Shelley Dep. at 112. This autobiographical testimonial is hardly proof of the utilization of a
sound scientific methodology.

different from) those in which Shreve's accident occurred. His only "test" of the snow

thrower, a three minute operation of it at the Shreves' home in Maryland in August, revealed

that the machine operated properly.

"Fault tree analysis" is a method used "primarily as a design tool for engineers."

*Doblar v. Unverferth Mfg. Co.*, 981 F. Supp. 1284, 1287 (D.S.D. 1997), *withdrawn and*

*sanctions imposed upon the expert mechanical engineer*, 185 F.R.D. 258 (D.S.D. 1999).

As Dr. Shelley explained:

> The term "fault tree analysis" is widely used in the defense industry to analyze
> complex weapons systems. It is a simple concept, using a top-to-bottom
> identification of all possible failure/hazard modes of a system. It can be
> envisioned as an inverted tree. You start at the trunk and flow down through
> each of the branches (each branch representing a subsystem). I used this term
> at the deposition only because of my long association with weapons systems
> during 29 years as a consultant to the army. In the case of an elementary
> mechanical system such as a snow thrower, the concept would be to simply
> identify all hazards to users of this product, so that these hazards could be
> eliminated in the design. This is the benchmark standard approach in
> mechanical engineering design with products that can cause injury to persons.

Shelley Aff. at 2-3.[10]

---

[10]Fault tree analysis has been further described as follows:

FTA is a powerful diagnostic tool for analyzing complex systems. It can
also be used for troubleshooting and maintenance, reliability calculations and
accident investigations. An FTA consists of a chart of undesirable events, using
symbols to indicate the relationships among these events. Because the FTA
focuses on      identifying how one particular outcome or event could occur, it is
often referred to as a "top down" approach . . . .

Conducting an FTA begins with selecting the top event. Then, a tree of
contributory events (branches and gates) is built. This process is continued
iteratively at successive levels using standardized symbols to identify primary and
secondary faults. The tree is complete at the bottom level, where the fundamental
(continued...)

Dr. Shelley allegedly used fault tree analysis to conclude that ice in the groove on the underside of the pulley caused the "dead man" levers to malfunction, allowing the auger/impeller blades to rotate when Shreve was not depressing the levers, thus causing the amputation of his fingers. The evidence in the record exposes two serious flaws in Dr. Shelly's methodology. First, a legitimate fault tree analysis requires consideration of all potential causes of an accident, including human error.[11] Dr. Shelley's fault tree analysis,

_____

(...continued)

> failure, error or other initiating event is identified. Once the tree is completed, it is used to evaluate the system, including "cut sets" (the minimum sequence that can cause the top event to occur) and "path sets" (events that, if none occur, will guarantee that the top event does not occur) . . . .
>
> There are several potential benefits from conducting an FTA. Since the FTA focuses on accident-related events, the costs of the analysis can be tailored to the needs of a specific project. The FTA highlights interrelationships among components and potential failures, . . . *an FTA can also include human error. An FTA can be very beneficial when the identity of a top event is known and concern centers on preventing that event or discovering how the top event could occur.* . . . The FTA also has limitations. The FTA does not accept "maybe" conditions-- i.e., an event must be a yes-or-no occurrence. One of the most frequent errors in conducting an FTA is neglecting to identify common causes (a cause that triggers multiple events.). . . . *Preparing an FTA requires intensive knowledge of the design, construction and use of the product.*

Bruce W. Main & Kristen J. McMurphy, *Achieving Optimal Product Design, Three Methods of Safety Analysis*, 17 No. 1 Prod. Liab. L. & Strategy 1 (July 1998)(emphases added).

[11]In light of the fuller elaboration of fault tree analysis set forth *supra* note 10, one must ask: where is Dr. Shelley's chart or diagram of the tree with the branches representing the possible causes of the accident? Based on his testimony, his "fault tree" would have only a trunk and no branches. The trunk would lead straight from the amputation of Shreve's fingers to the theory of the ice in the underside of the pulley groove, because there is no evidence that any other possible causes were considered.

In fact, as discussed in text *infra* pp. 26-28, it appears that Dr. Shelly did not undertake an investigation into the cause of the *accident* in which Shreve was injured. Rather, it appears, Dr. Shelly simply "investigated" the *snow thrower, for the evident purpose of hypothesizing how*

(continued...)

however, does not consider any possibility of human error contributing to Shreve's accident. When asked whether he considered the possibility that Shreve could have accidentally depressed the "dead man" lever with his left hand as he grasped to break his fall, Dr. Shelley replied, "No, not at all." Shelley Dep. at 124-29, 150. Dr. Shelly did not consider this possibility even though he acknowledged that it was indeed a possible explanation for the accident. *Id.* at 127. Significantly, the only testimony from Shreve at the time of Dr. Shelly's work on the case indicated that Shreve could not remember how his fall happened or where his hands were when he fell. *Id.* at 128. Neither did Dr. Shelley consider whether Shreve had tied down the "dead man" control, whether another person was depressing the "dead man" control, or whether Shreve himself was depressing the "dead man" control while he inserted his right hand into the discharge chute. Dr. Shelley's ostensible fault tree analysis likewise does not encompass the possibility that had Shreve extinguished the motor of the snow thrower before leaving it unattended, as the Owner's Manual instructed, the accident would not have happened. It would seem reasonable to include such potential human errors, e. g., leaving the motor running, as a potential cause of the accident, if indeed a fault tree analysis was the methodology employed. Dr. Shelly's failure to do so seriously undermines the validity of his fault tree analysis. *See Cooper*, 259 F.3d at 202 ("[I]f an expert utterly fails to consider alternative causes or fails to offer an explanation for why the proffered alternative

---

[11](...continued)
*Shreve's account of the accident might be harmonized with seemingly plausible mechanical phenomena.* There is no evidence before me that a valid fault tree analysis is properly adapted to such use.

-24-

cause was not the sole cause, a district court is justified in excluding the expert's testimony."). At bottom, Dr. Shelly's knowing disregard of human factors in his analysis constitutes a serious deficiency in his ostensible fault tree analysis as "assessments of the causes of events are inevitably influenced by the array of possible causes that are made salient to them." *Allen v. Chance Mfg. Co., Inc.*, 873 F.2d 465, 470 & n. 5 (1st Cir. 1989) (citing Fischheff, Slovic & Lichtenstein, *Fault Trees: Sensitivity of Estimated Failure Probabilities to Problem Representation*, 4 J. Experimental Psychol.: Human Perception & Performance 330 (1978)).

In sum, it is clear that Dr. Shelley did not perform an objective fault tree analysis as would a disinterested professional applying that analytical tool to discover how best to design a safe snow thrower after an injury-causing incident. *See Cooper*, 259 F.2d at 203 ("*Kumho Tire* emphasizes that the purpose of Rule 702's gatekeeping function is to make 'certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the field.'"). Rather, the conclusion is inescapable that to arrive at his opinion as to the cause of the accident, Dr. Shelly assumed that human error could not have played a role in the accident, relied upon his professional knowledge of mechanical systems to hypothesize about what theoretical possibilities inhered in the design of the snow thrower to support the (theoretically possible) manner of the alleged malfunction, and he then developed a seemingly plausible hypothesis-- ice build-up in the groove of the underside of the driven pulley-- to conform to the mechanical components present in the snow thrower.

The second major fault with Dr. Shelley's use of fault tree analysis to formulate an opinion about the cause of the accident is inextricably bound up with the first. That is, even if his hypothesis about a mechanical malfunction caused by ice build-up is sound, it was never tested. Engineering is a field of applied science. *Kumho Tire,* 526 U.S. at 148. It relies on scientific method. That method involves formulating a hypothesis to explain the world based upon what is already known and then subjecting the hypothesis to tests designed to falsify (or confirm) the hypothesis. *See Daubert,* 509 U. S. at 590. Dr. Shelley acknowledged that engineers use fault tree analysis to take into account potential risks in the formulation of designs. Shelley Dep. at 123. Essentially, fault tree analysis determines a design option (or options) that the engineer hypothesizes minimizes the anticipated risk. Before that design is adopted by a manufacturer, however, the hypothesis is tested. In Dr. Shelley's words, "this is what engineers do, they use basic bodies of engineering knowledge, and they come up with designs. They don't build everything first. Then they can build it and test it." Shelley Dep. at 123. Contrary to his own understanding of the proper approach, Dr. Shelley never bothered to test his hypothesis that ice build-up in the groove of the driven pulley increased the radius of the pulley. Equally inexplicable (and equally inexcusable) Dr. Shelly never tested the overarching major premise of his causation syllogism: that the quantum of heat generated by the v-belt and/or present within the engine compartment of the snow thrower was such as to permit moisture to freeze in the groove on the underside of the driven pulley. Shelley Dep. at 141. To his knowledge, neither his ice build-up theory, nor anything like it, has ever been

-26-

verified in any other way or in any other context, as it is not described in any literature with which he is familiar.[12] Defendants' experts, who I find are fully qualified in the relevant field of snow thrower design, manufacture and use, assert that the ice build-up hypothesis is essentially specious.

In short, Dr. Shelley arrived at his opinion that ice build-up in the groove on the underside of the driven pulley caused Shreve's fingers to be amputated by applying a methodology that is the *opposite* of the scientific method.[13] *It appears that he posited a seemingly plausible mechanical defect, and an etiology for it that is grounded in unexceptional laws of physics and chemistry (e. g., snow melts; moisture creates rust in some metals) and unexamined assumptions (e. g., no human error contributed to the incident), to*

---

[12]Indeed, Dr. Shelley acknowledged he was guessing:

Q:    Can you quantify to me the extent of freezing that you believe would be necessary to increase the effective driven belt pulley diameter so as to facilitate the continued rotation of the auger impeller blades?

A:    You would probably get-- *and this is just a guess.* Because I'm doing this based on the size of the v-belt and the size of the pulley. If you've got a quarter of an inch or three-eighths of an inch increase of radius of the driven pulley, that would probably be enough to do it. And that's a fairly thin ring of ice to be forming up in that pulley.

Q:    And have you done any testing of any nature to confirm what you just stated?

A:    No. Again, this is best engineering judgment.

Shelley Dep. at 149 (emphasis added). In the context of this case, Dr. Shelly's resort to "best engineering judgment" is nothing more than an "educated guess." *Kumho Tire* and Rule 702 require more than an "educated guess."

[13]Dr. Shelly sought to analogize his ice build-up theory formulated for this case to alleged instances in which wet garden dirt becomes embedded in the grooves of the driven pulleys of certain rototillers whose driven pulleys are operated below the surface of the soil. *See* September 5, 2000 Report at 13. Nevertheless, the differences between alleged ice build-up, on the one hand, and mud build-up, on the other hand, could not be more obvious.

-27-

*explain Shreve's accident, after refusing to consider any other possible explanations. Then,*

*he concluded that his hypothetical cause was "more likely than not" true without any attempt*

*to verify or falsify it.* Plainly, Dr. Shelley's theory was capable of being tested, but it was

not.[14] Although the technique of fault tree analysis is relied upon within the engineering

community for certain purposes, there has been no showing that Dr. Shelly's use of that label

to describe his work in this case mimics the work of systems designers who employ that

technique in the real world. Reliability is plainly lacking here. *See Kumho Tire*, 526 U.S. at

149-50 (citing *Daubert*, 509 U.S. at 592-94).

Dr. Shelley attempted to justify his methodology by explaining that the snow thrower

---

[14]During deposition questioning about the lack of verification of his theories about water freezing inside the snow thrower, the operation of which indisputably generates heat in and about its mechanical components, Dr. Shelley offered this observation:

> If I could just add one thing, without sounding like I'm lecturing. We got a man on the moon eventually. We didn't run a test for us to do it. We designed the system on paper and on computer and we launched him and got him up there. So in the same way, with the elementary problem, *an engineer who understands heat transfer looks at this and arrives at a professional conclusion.* And that's all I can offer you.

Shelley Dep. at 142 (emphasis added). Contrary to Dr. Shelly's self-congratulatory testimonials, not only did "we" get "a man on the moon," "we" also have snow throwers (and other similarly designed residential power equipment) whose impellers stop rotating when the auger lever is released, and neither before nor after Shreve's accident has any person ever encountered what Shreve claims to have encountered. Although "sometimes truth is stranger than fiction," *supra* note 1, Dr. Shelly seems not to have understood that plaintiffs' burden in this case is not simply to hypothesize about theoretical possibilities, but to offer proof of an actual event. *See Ford Motor Co. v. General Accident Ins. Co.*, __ A.2d __ (Md. 2001), No. 100, 2001 WL 1029363, at * 7 n.14 (Md. Sept. 10, 2001) (noting that in a products liability case, burden is on plaintiff to show "what might possibly have happened probably did happen")(quoting *Harrison v. Bill Cairns Pontaic of Marlow Heights, Inc.*, 549 A.2d 385, 392 (Md. Ct. Spec. App. 1988). The *Kumho Tire* jurisprudence is necessary precisely because too many "experts," to paraphrase Dr. Shelly's above testimony, do little more than merely "look[] at [a claim or defense] and arrive[] at a professional conclusion" supporting that claim or defense.

is a simple machine, implying that verification was not needed. That may be an opinion, but it is not a scientific opinion, or an opinion supported by appropriate validation; rather, it is merely Dr. Shelly's subjective opinion. *Cf. id.,* 526 U. S. at 157 (stating that "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert" (internal quotation marks omitted)(quoting *General Electric v. Joiner*, 522 U.S. 136, 146 (1997))). The Fourth Circuit does not accept opinions from experts simply because the "expert says it is so." *Alevromagiros v. Hechinger Co.,* 993 F.2d 417, 421 (4th Cir. 1993) (quoting *Viterbo v. Dow Chemical Co.*, 826 F.2d 420, 421 (5th Cir. 1987)).

The Shreves' attempt to draw support from *Freeman v. Case Corp.*, 118 F.3d 1011 (4th Cir. 1997), *cert. denied*, 522 U.S. 1069 (1998), is unavailing. In *Freeman*, neither the qualifications of the proffered expert, nor the reliability of his methodology and opinions were contested. 118 F.3d at 1016 & n.6. The issue presented was whether the expert testimony concerning design defect was sufficient to support the jury verdict. The Fourth Circuit explained:

> [The expert] did not simply opine on the basis of his "own subjective opinion." Rather he applied his [several years of] experience and training in tractor design in reviewing numerous published materials, including papers by the Society of Agricultural Engineers, extensive industry literature, various tractor specifications, and trade journals before reaching his conclusions. [The expert] also inspected Freeman's [tractor] and performed various tests on it, which indicated that the tractor did indeed lurch when both the SRC and brake pedals were pressed and the clutch released.

*Id.* at 1016. In this way, the expert confirmed his hypothesis as to how the tractor accident

could have occurred. *Id.* Dr. Shelley has no experience in the design of snow throwers for a manufacturer, and he has studiously refrained from testing his hypothesis concerning a possible defect in Shreve's snow thrower.

For the reasons stated, plaintiffs have not established by a preponderance of the evidence, *see Cooper*, 259 F.3d at 199, that Dr. Shelly's ostensible use of fault tree analysis has permitted him to derive opinions as to causation that are reliably grounded in the field of engineering, and those opinions shall therefore be excluded.

> 2.     Dr. Shelly's Opinions As To The Discharge Chute Do Not Reliably
>        Arise From A Valid "Risk Utility Analysis"

Dr. Shelley purports to rely upon "risk utility analysis" to support his opinion that despite its compliance with all relevant industry standards, the snow thrower at issue had inadequate safeguards because an enclosed discharge chute and/or an "m wire" presented viable cost effective design alternatives that would have prevented Shreve's accident. However, these opinions also founder on Dr. Shelley's lack of qualifications and the failure to test his hypotheses.

Dr. Shelley explained "risk utility analysis" as follows:

> The concept of risk-utility is, I hope, very well known. It simply means an evaluation of the benefit and utility of, as examples, a proposed guard or protective system, versus the decrease in utility of the product. A common, limiting example would be to fully enclose a circular saw blade: While the risk of injury would be completely eliminated, so would all the utility, since the saw could not cut any material. Hence, in actual designs the blade is only partially guarded.

Shelley Aff. at 2-3. As explained above, apart from his work as an expert witness for product

liability litigation, Dr. Shelley has no experience designing snow throwers, testing their

safety, pricing or marketing them, or operating them. Dr. Shelley's alleged "design" of an

enclosed discharge chute can hardly be called a design. As depicted in his deposition exhibit

6, it is only the vaguest of sketches. He testified that the chute

> could possibly be eight or ten inches. It could be a relatively short distance.
> I'm not talking about three or four feet. It would look like a trombone horn.
> It would flare out so that you minimize the clogging problem, which I realize
> is a problem with snow throwers. But in the process of doing that, you start to
> really reduce the risk of injury. You'll never eliminate it, because in order [sic]
> totally eliminate it, the machine wouldn't do anything. You would have a
> totally useless snow thrower. Safe to use, but it doesn't throw snow.
>     So, as an engineer-- and this is standard in all engineering analysis-- you
> go through a risk utility study. And you decide, if you do this, what happens
> over here. But clearly, in something like this, it is my opinion that you could
> have somewhat of an enclosed discharge chute versus this thing, which is wide
> open . . . . First of all-- and, again, this is done rather quickly-- it would be
> basically some kind of any [sic] open flaring design. And clearly one can go
> through a very critical analysis as to what the radii of curvature would be of
> this thing and everything else . . . . And this would really prevent a person
> falling and getting his hand in the opening, compared to this thing which is
> wide open. This is like an open manhole in the street that you can fall right
> into. There's absolutely nothing to stop you from moving into that opening.
> And, clearly there are a hundred flaring designs you could come up with. But
> this would be part of the design-engineer of the company through trying this,
> *testing it*, and easily making it. And it would add virtually nothing to the cost
> of the product.

Shelley Dep. at 113-15 (emphasis added). Asked to clarify how far the chute would extend,

Dr. Shelley replied: "It could be 8 to 15 inches. I mean, I really don't know." *Id.* at 116. Dr.

Shelley admitted that he conducted no testing to ascertain whether the extended enclosed

discharge chute would work or would increase the snow thrower's safety. Indeed, he

admitted that he had never used a snow thrower with such a device and that he was aware of

-31-

no empirical data, studies or analysis of any kind to back up his claim that this design option

would work. When pressed for verification of his claim he explained as follows:

A:      No. But what I will add to that is that I do know that it can be done. It's a
        basic problem which would be modeled using fluid mechanics. Because snow
        stream can be modeled as a stream of moving particles. You can size the area,
        get the slope angles, do a very scientific analysis of that problem if you had
        to.
Q:      But my question to you, sir, is that aside from your believing it could be done–
A:      No, I'm not believing it. It's a fact it can be done.
Q:      Aside from you saying it can be done, have you done it?
A:      No, I have not.

Shelley Dep. at 118-19. Nevertheless, Dr. Shelley stated that the need for this guard was his

"very considered professional opinion." *Id.* at 112.

After learning from the testimony of the defense experts, Sassaman and Elmy, that

no manufacturer used a flaring enclosed discharge chute on a snow thrower, Dr. Shelley

submitted a supplemental report after the deadline for expert submissions, offering the

alternative of an "m wire" guard for the discharge chute. Shelley Dep. at 181. One

manufacturer, Toro, uses an "m wire" guard on two or three of its snow thrower models.

Dr. Shelley offered no testimony that he had ever used an "m wire" or tested it. He testified,

nevertheless, that the flaring extended enclosed discharge chute would be the preferable

alternative. Shelley Dep. at 189.[15]

Dr. Shelly's alternative design testimony is inadmissible. With all respect, Dr.

---

[15]Dr. Shelly's supplemental report, in which he mentions for the first time in this case the
so-called "m wire" chute guard, prompted plaintiffs to file a motion for leave to amend. The
motion to amend is denied for the reasons discussed *infra* in Part V.

Shelly's deposition testimony regarding alternative designs reads like the transcript of a

brainstorming session attended by second semester undergraduate engineering students, not

a serious effort to craft an admissible alternative design. I encouraged plaintiffs to arrange

for Dr. Shelly to appear at the *Daubert* hearing in this case but he did not. I do not criticize

plaintiffs in that regard, given the expense of such efforts, but as a consequence, I am left

with the record described here.

In my view, it is unmistakable that Dr. Shelly did not "employ[] in the [deposition]

the same level of intellectual rigor that characterizes the practice of [mechanical

engineering]." *Cooper*, 259 F.3d at 203. "Talking off the cuff-- deploying neither data nor

analysis-- is not acceptable methodology." *Lang v. Kohl's Food Stores, Inc.*, 217 F.3d 919,

924 (7th Cir. 2000), *cert. denied*, 531 U.S. 1076 (2001). Moreover, "testing is important in

alternative design cases." *Bourelle v. Crown Equipment Corp.*, 220 F.3d 532, 538 (7th Cir.

2000). Considering the host of indicia to which courts have turned in evaluating the

soundness of methodologies in alternative design cases, Dr. Shelly's testimony falls far short

of reflecting the level of reliability required and therefore will be excluded. *See Milanowicz*

*v. The Raymond Corp.*, 148 F.Supp.2d 525, 536 (D.N.J. 2001)("Thus, to recapitulate, among

the indicia of reliability that courts may consider in evaluating expert testimony under Rule

702 are the following: 1) federal design and performance standards; 2) standards established

by independent standards organizations; 3) relevant literature; 4) evidence of industry

practice; 5) product design and accident history; 6) illustrative charts and diagrams; 7) data

from scientific testing; 8) the feasibility of suggested modification; and 9) the risk-utility of suggested modification.").

> 3.    Dr. Shelly's Opinions About Adequacy of Warnings Are Not Admissible

Dr. Shelley's report concludes that the "the lack of any safety warnings in the manual on the danger of losing one's footing near the snow thrower, and making inadvertent contact with the exposed impeller blades, is a serious design defect of the Craftsman Snow Thrower." Sept. 5, 2000 Report at 18. He proposed, off the top of his head during his deposition, that a proper warning would state: "Hazardous, sharp moving rotor in discharge opening. Use extreme caution when standing on slippery surfaces near discharge opening." Shelley Dep. at 100. He acknowledged that he did not know whether any snow thrower manufacturer used comparable warning language, Shelley Dep. at 101, that such a warning is not specified by applicable ANSI standards, *id.* at 103, and that he was aware of no government agency or body that had raised any concern about the adequacy of the warnings for walk behind snow throwers. *Id.* at 105.

The Owner's Manual for the subject snow thrower warns in its initial safety rules: "Exercise caution to avoid slipping or falling, especially when operating in reverse." Shreve Opp. Ex. E, Appendix A, p. B2 of 39.    The safety rules also specify: "Do not put hands or feet near or under rotating parts. Keep clear of the discharge opening at all times." *Id.* B3 of 39. They also state: "7. Stop the engine (motor) whenever you leave the operating position, before unclogging the auger/impeller housing, or discharge guide, and when

-34-

making any repairs adjustments or inspections." In addition, the rules admonish: "9. Take all possible precautions when leaving the snow thrower unattended. Disengage the auger/impeller, shift to neutral, stop engine, and remove key." *Id.* The safety rules state in different places to "wear footwear that will improve footing on slippery surfaces," *id.*, and, "[a]lways be sure of your footing, and keep a firm hold on the handles. Walk; never run." *Id.* at B4 of 39. Warning labels on the snow thrower itself show a foot near the auger with the words "!Danger Avoid injury from rotating auger keep hands, feet and clothing away!" *id.* at B4 of 39, and a picture of a hand near the impeller blades in the discharge chute with the words: "! Danger stop the engine before unclogging discharge chute! " *Id.*

For the reasons stated above, Dr. Shelley is no more qualified than any member of the jury to offer opinions about the adequacy of warnings for snow throwers. In addition, plaintiffs offer no empirical data or testing to support Dr. Shelley's conclusions as to the desirability and adequacy of the warnings and instructions provided by defendants here. "The same reliability requirements that apply to alternative designs apply to alternative warnings." *Bourelle*, 220 F.3d at 538 (citations omitted). Accordingly, Dr. Shelley is precluded from offering an expert opinion in this case.

      C.      Defendants' Experts Are Qualified and to the Extent Their Opinions May Be Relevant, They Are Admissible

The Shreves responded to defendants' motion to exclude Dr. Shelly's testimony and filed their own "Motion to Conditionally Strike Defendants' Experts" ("Shreve Cross Mot. to Preclude"). Stating "[w]hat's good for the goose is good for the gander," the Shreves'

cross-motion adopted "by reference" the defendants' motion to exclude experts, as well as defendants' memorandum of law. Shreve Cross Mot. to Preclude at 2-3. The Shreves argued that because the defense experts, Elmy and Sassaman, failed to test Shreve's snow blower under conditions similar to those obtaining on the date of the accident, they failed to offer reliable opinions disproving Dr. Shelly's ice build-up theory. Plaintiffs have misconstrued the defense burden with regard to plaintiffs' theory of causation.[16]

First, the Shreves have misread the nature of the defense expert testimony. Sassaman and Elmy testified that had Shreve followed the operating manual safety rules and turned off the motor while leaving it unattended to retrieve his gloves, Shreve's injury never would have occurred. Sassaman Report at 10. They each also testified that Dr. Shelley's theory of ice build-up in the groove in the underside of the driven pulley has never been

_____

[16]In addition to their *Daubert* challenge to the defendants' experts, plaintiffs argue that defendants' expert testimony cannot be admitted because it is being used improperly to attack Shreve's credibility. Plaintiffs claim that this is a "bold" but clearly improper end. They argue that defendants' experts cannot testify as to Shreve's credibility and that the only basis for their testimony is their "hunch" that Shreve is not telling the truth. This assertion is clearly a misstatement of defendants' expert testimony. In a product liability case where the central issue is whether and/or how the product is defective, defendants are entitled to offer expert evidence on the issues material to the case. While that evidence might reflect on Shreve's credibility, that does not affect its admissibility.

Plaintiff compares this to a scenario in which a therapist testified to whether she believes a child is telling the truth about being sexually abused. *Bohnert v. State*, 539 A.2d 657 (Md. 1988). The concern of *Bohnert*, which no doubt has a federal analogue, *see, e.g., United States v. Azure*, 801 F.2d 336, 340-41 (8th Cir.1986), is clearly inapposite. Defendants' experts do not testify to Shreve's character for telling the truth, but rather to their evaluation of how the accident may have happened and what the mechanics of the product allow. Their testimony indirectly questions Shreve's account of the accident, but it does not articulate an opinion on his character for truthfulness. *Cf.* Pl.'s Reply to Def's Opp. to Pl.'s Cross Mot. at 1-7.

documented by anyone and is impossible. Elmy testified that he has participated in the testing of many snow throwers under numerous snowy conditions, though not the exact conditions present during Shreve's accident.

Sassaman is qualified to offer expert testimony concerning the design, safety, and operation of snow blowers. He has a B.S. in mechanical engineering and has worked professionally in the design, manufacturing, safety, and testing of outdoor power equipment for over 30 years. During these years, he has had extensive involvement in the design and testing of snow throwers, including four years as chief engineer for a manufacturer of snow throwers. He has participated in the development and application of snow thrower standards of the American National Standards Institute and the International Standards Organization. Sassaman also inspected Shreve's snow thrower.

Raymond Elmy is likewise qualified to offer expert testimony concerning the design, safety, and operation of snow throwers. He has a B.S. and a number of graduate courses in mechanical engineering and has worked for Murray for over 43 years. Since 1984 he has served as Vice-President of Design Engineering at Murray, and he holds various patents relating to the design of outdoor power equipment. During his employment with Murray, he has regularly engaged in the design, operation, testing, and evaluation of outdoor power equipment, including snow throwers. He has participated extensively with the American National Standards Institute and governmental groups, including the Consumer Product Safety Commission, in the promulgation of safety standards for, or oversight of the safety

of, consumer outdoor power equipment, including snow throwers.

He also inspected Shreve's snow thrower. Elmy's report states several conclusions, including: (1) "A power transmitting V-belt generates heat from cyclic bending and external friction . . . . [A]dditional heat energy is conducted to the belt from the engine;" (2) A diverging fully enclosed extension tube over the impeller would decrease the safety of the machine by increased discharge clogging; (3) No walk behind consumer snow thrower has a rigid flaring enclosed discharge chute; (4) Water cannot migrate to the pulley or its groove, and the pulley's high rotational speed would impart centrifugal force on any substance located on its surface; (5) It is not possible to build up enough ice on the auger/impeller drive pulley groove such that the belt slack utilized for clutching purposes is completely taken up by the accumulated ice in the pulley groove; (6) The cause of the accident was Shreve's failure to follow safety messages located on-product and in the manual that instructed the user to turn off the engine when the user left the operator's position in addition to losing his footing when in close proximity to the machine while it was running. Elmy testified on deposition that while he had not tested snow throwers "under those very specific conditions" present during Shreve's accident, "we have tested snow throwers extensively over the years under all kinds of snow conditions, and ice just doesn't happen." Elmy Dep. at 137.

It is thus obvious that, unlike Dr. Shelley, both Sassaman and Elmy are qualified to offer expert testimony concerning the design, safety, and operation of snow throwers.

Furthermore, neither Sassaman nor Elmy is a proponent of Dr. Shelley's untested ice build-up theory and thus neither of defendants' experts has the burden of demonstrating that this theory of causation is anything other than pure conjecture. Put simply, there is no burden on Sassaman or on Elmy to conduct tests in an effort to disprove an opinion held by Dr. Shelley. The burden is on the Shreves, as plaintiffs in this case, to justify the reliability of Dr. Shelley's design defect conditions. *Cooper*, 259 F.3d at 199 ("The proponent of the testimony must establish its admissibility by a preponderance of proof.") (citing *Daubert*, 509 U. S. at 592 n. 10). Manifestly, plaintiffs have failed to carry their burden as to Dr. Shelly; in contrast, defendants have easily satisfied their burden under Rule 702 as to their experts.[17]

IV.    DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW AS TO ALL THEORIES EXCEPT STRICT LIABILITY BASED ON DESIGN DEFECT AND IMPLIED WARRANTY OF MERCHANTABILITY; PLAINTIFFS ARE NOT ENTITLED TO SUMMARY JUDGMENT AS TO ANY THEORY

Defendants' motion for summary judgment addresses the following five claims: (1) strict liability under a theory of defect in manufacturing; (2) strict liability under a theory of failure to warn; (3) deceptive and unfair trade practices under the Maryland Consumer Protection Act; (4) breach of expressed warranty; and (5) breach of an implied warranty of

---

[17]In view of the exclusion of the testimony of Dr. Shelly, the desirability of (or indeed, in light of relevance considerations, the admissibility of) expert testimony from the defendants is uncertain. As I discuss in detail *infra* Part IV, the Shreves will be permitted to present their design defect and implied warranty claims to the jury even without expert testimony. In any event, the issues of whether the defendants have a need for expert testimony as such, and if so, its admissibility, need not be determined at this time.

merchantability. The Shreves cross-move for summary judgment on the following six claims: (1) implied warranty of merchantability (regarding "the impeller blade defect"); (2) Consumer Protection Act claim; (3) breach of express warranty (based on representations in the Owner's Manual); (4) manufacturing defect; (5) defect in design; and (6) loss of consortium.[18]

A.    Summary Judgment Standards

Pursuant to Fed. R. Civ. P. 56 (c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 247 (1986). A fact is material for purposes of summary judgment, if when applied to the substantive law, it affects the outcome of the litigation. *Id.* at 248. Summary judgment is also appropriate when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A party opposing a properly supported motion for summary judgment bears the burden of establishing the existence of a genuine issue of material fact. *Anderson*, 477 U.S. at 248-49. "When a motion for summary judgment is made and supported as provided in [Rule 56], an adverse party may not rest upon the mere allegations or denials of the adverse

---

[18]Certain other claims asserted in the first amended complaint have been abandoned.

party's pleading, but the adverse party's response, by affidavit or as otherwise provided in

[Rule 56] must set forth specific facts showing that there is a genuine issue for trial." Fed.

R. Civ. P. 56(e); *see Celotex Corp.*, 477 U.S. at 324; *Anderson*, 477 U.S. at 252; *Shealy v.*

*Winston*, 929 F.2d 1009, 1012 (4th Cir. 1991). Of course, the facts, as well as justifiable

inferences to be drawn therefrom, must be viewed in the light most favorable to the

nonmoving party. *Matushita Elec. Indust. Co v. Zenith Radio Corp.*, 475 U.S. 574, 587-88

(1986). The court, however, has an affirmative obligation to prevent factually unsupported

claims and defenses from proceeding to trial. *Felty v. Graves-Humphreys Co.*, 818 F.2d

1126, 1128 (4th Cir. 1987).

When both parties file motions for summary judgment, as here, the court applies the

same standards of review. *Taft Broadcasting Co. v. United States*, 929 F.2d 240, 248 (6th

Cir. 1991); *ITCO Corp. v. Michelin Tire Corp.*, 722 F.2d 42, 45 n.3 (4th Cir. 1983) ("The

court is not permitted to resolve genuine issues of material facts on a motion for summary

judgment-- even where . . . both parties have filed cross motions for summary judgment."),

*cert. denied*, 469 U.S. 1215 (1985).

The role of the court is to "rule on each party's motion on an individual and separate

basis, determining, in each case, whether a judgment may be entered in accordance with the

Rule 56 standard." *Towne Mgmt. Corp. v. Hartford Acc. and Indem. Co.*, 627 F. Supp. 170,

172 (D. Md. 1985) (quoting Wright, Miller & Kane, *Federal Practice and Procedure; Civil*

2d § 2720 (2d ed. 1993)); *see also Federal Sav. and Loan Ins. Corp. v. Heidrick*, 774 F.

Supp. 352, 256 (D.Md. 1991). "[C]ross-motions for summary judgment do not automatically

empower the court to dispense with the determination whether questions of material fact

exist." *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Voight*, 700 F.2d

341, 349 (7th Cir. 1983), *cert. denied*, 464 U.S. 805. "Rather, the court must evaluate each

party's motion on its own merits, taking care in each instance to draw all reasonable

inferences against the party whose motion is under consideration." *Mingus Constructors,*

*Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir. 1987). Both motions may be denied.

*See Shook v. United States*, 713 F.2d 662, 665 (11th Cir. 1983).

"[B]y the filing of a motion [for summary judgment] a party concedes that no issue

of fact exists under the theory he is advancing, but he does not thereby so concede that no

issues remain in the event his adversary's theory is adopted." *Nafco Oil and Gas, Inc. v.*

*Appleman*, 380 F.2d 323, 325 (10th Cir. 1967); *see also McKenzie v. Sawyer*, 684 F.2d 62,

68 n.3 (D.C. Cir. 1982) ("[N]either party waives the right to a full trial on the merits by

filing its own motion."). When cross-motions for summary judgment demonstrate a basic

agreement concerning what legal theories and material facts are dispositive, however, they

"may be probative of the non-existence of a factual dispute." *Shook*, 713 F.2d at 665.

B.    Strict Liability Claims

To recover on a theory of strict liability in Maryland, a plaintiff must establish the

following elements:

(1) the plaintiff was the user or consumer of an alleged defective product;
(2) the defendant was the seller of the product and at the time of sale was

-42-

engaged in the business of selling such a product;

(3) at the time of sale the product was defective;

(4) the product reached the plaintiff without substantial change in the condition in which it was sold;

(5) the defect made the product unreasonably dangerous to the plaintiff; and

(6) the defect proximately caused plaintiff's injuries.

*Phipps v. General Motors Corp.*, 363 A.2d 955, 959 (Md. 1976); Restatement (Second) of Torts §402A (1965). A product defect can arise from the design of the product, a deficiency in its manufacture, or from the absence or inadequacy of instructions or warnings as to its safe and appropriate use. *Simpson v. Standard Container Co.*, 527 A.2d 1337, 1339-40 (Md. Ct. Spec. App.), *cert. denied*, 533 A.2d 1308 (Md. 1987). A negligence theory of products liability, in contrast, focuses upon the reasonableness of the manufacturer's acts and omissions, including the reasonableness of any warning, rather than upon the existence of a defect in the product itself. *Phipps*, 363 A.2d at 958. "The elements of proof are the same whether the claim [is] characterized as one for strict liability or negligence . . . or breach of warranty." *Watson v. Sunbeam Corp.*, 816 F. Supp. 384, 387 n.3 (D. Md. 1993) (internal citations omitted); *see Ford Motor Co. v. General Accident Ins. Co.*, __ A.2d __, (Md. 2001), No. 100, 2001 WL 1029363, at *6 (Md. Sept. 10, 2001).

The Shreves have asserted strict liability claims based on all available theories except negligence.[19] Defendants have moved for summary judgment on the manufacturing defect and failure to warn claims, while the Shreves have moved for summary judgment on the

---

[19]Plaintiffs asserted a negligent failure to warn claim.

-43-

engaged in the business of selling such a product;

(3) at the time of sale the product was defective;

(4) the product reached the plaintiff without substantial change in the condition in which it was sold;

(5) the defect made the product unreasonably dangerous to the plaintiff; and

(6) the defect proximately caused plaintiff's injuries.

*Phipps v. General Motors Corp.*, 363 A.2d 955, 959 (Md. 1976); Restatement (Second) of

Torts §402A (1965). A product defect can arise from the design of the product, a deficiency

in its manufacture, or from the absence or inadequacy of instructions or warnings as to its

safe and appropriate use. *Simpson v. Standard Container Co.*, 527 A.2d 1337, 1339-40 (Md.

Ct. Spec. App.), *cert. denied*, 533 A.2d 1308 (Md. 1987). A negligence theory of products

liability, in contrast, focuses upon the reasonableness of the manufacturer's acts and

omissions, including the reasonableness of any warning, rather than upon the existence of

a defect in the product itself. *Phipps*, 363 A.2d at 958. "The elements of proof are the same

whether the claim [is] characterized as one for strict liability or negligence . . . or breach of

warranty." *Watson v. Sunbeam Corp.*, 816 F. Supp. 384, 387 n.3 (D. Md. 1993) (internal

citations omitted); *see Ford Motor Co. v. General Accident Ins. Co.*, __ A.2d __, (Md.

2001), No. 100, 2001 WL 1029363, at *6 (Md. Sept. 10, 2001).

The Shreves have asserted strict liability claims based on all available theories except

negligence.[19] Defendants have moved for summary judgment on the manufacturing defect

and failure to warn claims, while the Shreves have moved for summary judgment on the

---

[19]Plaintiffs asserted a negligent failure to warn claim.

*General Accident Ins. Co.*, __ A.2d __ (Md. 2001), No. 100, 2001 WL 1029363, at * 7 n.14

(Md. Sept. 10, 2001):

> There are some circumstances, as presented in *Phipps v. General Motors Corporation*, 278 Md. 337, 345-46, 363 A.2d 955, 959 (1976), in which the product may be deemed "defective and unreasonably dangerous without the necessity of weighing and balancing the various factors involved" -- cases in which the design defect may be inferred . . . .
>
> "For example, the steering mechanism of a *new* automobile should not cause the car to swerve off the road . . .; the drive shaft of a *new* automobile should not separate from the vehicle when it is driven in a normal manner . . .; the brakes of a *new* automobile should not suddenly fail . . .; and the accelerator of a *new* automobile should not stick without warning, causing the vehicle suddenly to accelerate."

*Id.* (alterations in original)(quoting *Phipps*, 363 A.2d at 959). In other words, *new*

automobiles do not display the listed characteristics in the absence of a design defect. *See*

*also Singleton v. International Harvester Co.*, 685 F.2d 112, 114 (1981). The court

distinguished these examples from the circumstances presented in *Harrison v. Bill Cairns*

*Pontaic of Marlow Heights, Inc.*, 549 A.2d 385 (Md. Ct. Spec. App. 1988)*, because the

vehicle in *Harrison* "had many miles of usage prior to the incident giving rise to the

litigation." *General Accident Ins. Co.*, __ A.2d __ (Md. 2001), No. 100, 2001 WL 1029363,

at * 7 n.14.

In *Harrison*, the Court of Special Appeals of Maryland had adopted the factors to be

used in the second method mentioned above as an acceptable model in the proof of a product

defect. The court reasoned that the following factors must be weighed in determining

whether a product defect may be inferred from circumstantial evidence:

(1) expert testimony as to possible causes; (2) the occurrence of the accident a short time after the sale; (3) same accidents in similar products; (4) the elimination of other causes of the accident; (5) the type of accident that does not happen without a defect.

*Id.* at 390 (*citing Cornell Drilling Co. v. Ford Motors Co.*, 359 A.2d 822, 827 (Pa. Super. 1976); Prosser, *Law of Torts*, § 103, at 673-74 (4th ed. 1971)); *see General Accident Ins. Co.*, __ A.2d __, 2001 WL 1029363, at *6. The court emphasized that a plaintiff must "present evidence sufficient for a jury inference that [the product] was defective and that this defect existed at the time of the manufacture." *Harrison*, 549 A.2d at 390.

Thus, under the *Harrison* test, if the available evidence is such that: (1) expert testimony tends to support the possibility of a design or manufacturing defect (or tends to exclude causes not attributable to a defect); (2) the injury-causing occurrence takes place shortly after the product is delivered or put into use; (3) similar incidents have been reported in respect to the product; (4) other potential explanations of the injury-causing occurrence are negated; and (5) the occurrence is of a type that ordinarily might not be expected to happen in the absence of a defect, then plaintiff will be allowed to get to the jury on the question of the presence *vel non* of a defect. To the extent that a plaintiff's showing on one or more of these factors cuts against these conclusions, then the strength of the inference of a defect weakens and plaintiff risks the entry of summary judgment for defendant.

Judge Motz applied the *Harrison* five-factor test in *Watson v. Sunbeam Corp.*, 816 F. Supp. 384 (D. Md. 1993), in evaluating (and ultimately denying) a motion for summary judgment filed by defendants. *Watson* involved a case in which a fire started around an

matches; and (2) the wires and cord of the blanket had been crossed contrary to product

warnings, but each of these potential causes was directly contradicted by deposition

testimony. *Id.* at 388-89. There was also evidence that one other claim had been brought

concerning the blanket model involved in *Watson. Id.* at 389. Finally, the court concluded

that the accident was one that did not carry an unequivocal inference that it resulted from a

defect. *Id.* Accordingly, the court concluded:

> [V]iewing the evidence most favorably to plaintiffs, three of the *Harrison*
> factors favor plaintiffs (expert testimony of possible causes, the timing of the
> accident and the elimination of other causes), one is essentially neutral (the
> involvement of the same product in similar accidents) and one favors
> defendants (the type of accident). Against this background I cannot say that
> a rational jury could not return a verdict in favor of plaintiffs. Accordingly,
> defendants are not entitled to the summary judgment which they seek.

*Id.* at 389.[21]

The final method of proving a defect is the method originally chosen by the Shreves

in this case: direct affirmative proof by expert testimony establishing a specific defect.

Although I have concluded that Dr. Shelly's testimony does not clear the bar of Fed.

R. Evid. 702, nevertheless, the Shreves will be permitted to rely on the *Harrison* test in

_____

[21]It is worth noting that it is not altogether clear that plaintiff's electrical engineering
expert in *Watson* would be permitted to testify today in light of the court's gatekeeping role. *But
see supra* note 20. *Watson* was decided in March 1993, several months before the June 28, 1993,
decision of the Supreme Court in *Daubert*, and obviously long before the March 23, 1999,
decision in *Kumho Tire*. Judge Motz went to some length to permit plaintiffs' expert testimony in
*Watson* to receive consideration in the adjudication of the summary judgment motion, noting that
"[i]t appears that what [the expert] may have meant in giving the testimony which I have quoted
is not that he was inferring the existence of a defect from the occurrence [which would render his
testimony flatly inadmissible] but rather that he was inferring from the occurrence the fact that
the defect which he identified was its cause." *See Watson*, 816 F. Supp. at 387.

respect to their design defect claim. It is not the rule that expert evidence must be presented

to prove the existence of a defect. *See, e.g., Virgil*, 484 A.2d at 656. "The general rule is well

established that expert testimony is only required when the subject of the inference is so

particularly related to some science or profession that it is beyond the ken of the average

layman." *Id.* In *Virgil*, for example, expert testimony was deemed unnecessary because the

average lay person can evaluate whether a defect exists when a thermos bottle explodes or

implodes. *Id.*

By his assertion, based on his claimed first hand knowledge, that the impeller and

auger blades of the snow thrower continued to rotate after the auger drive lever was released,

coupled with his sworn assurance that he did not misuse the snow thrower, Shreve has

produced sufficient evidence of the existence of a defect or malfunction for the purpose of

summary judgment. Obviously, when a specifically-designed safety apparatus on power

equipment performs exactly contrary to the manner in which it is intended to perform, a

reasonable jury would be entitled to conclude that the malfunction was the result of a

product defect. Thus, the Shreves correctly argue that "[e]vidence of that which would *not*

happen *absent* a product defect, and evidence in the record tending to eliminate other causes,

permits the inference of a product defect." Pls.' Cross Mot. at 13 (emphasis in original).

Yet, as will be discussed below, to establish that the defect resulted from a

manufacturing defect, as opposed to a design defect, plaintiff must present more evidence

than that which merely allows an inference of defect. Furthermore, as a matter of law, there

-49-

is insufficient evidence to support a cognizable failure to warn claim, and there is insufficient evidence to support the design defect claim based on the discharge chute, which requires proof by expert testimony.

           1.      Manufacturing Defect Claim

      The Shreves argue that defendants are not entitled to summary judgment on this count because they have demonstrated that the snow thrower contained a defect at the time it left the manufacturer, and that even without expert testimony, a genuine issue of material fact is raised. They argue further that they are entitled to summary judgment on this claim because defendants have only offered speculative evidence through their experts to show that the auger drive lever was depressed when Shreve's accident occurred. These contentions are unavailing. Because defendants have demonstrated that no genuine issues of material fact exist as to the manufacturing defect claim, summary judgment shall be granted to the defendants.

      Under Maryland law, "[t]he relevant inquiry in a strict liability action focuses not on the conduct of the manufacturer but rather on the product itself . . . Thus the standard to be applied in determining whether a product is defective becomes critical." *Phipps*, 363 A.2d at 958-59 (citation omitted). "Proof of a defect in the product at the time it leaves the control of the seller implies fault on the part of the seller sufficient to justify imposing liability for injuries caused by the product." *Id.* at 963. Courts have not always been clear in distinguishing the proof needed to establish a design defect as opposed to a manufacturing

defect. In many cases, the two have not been distinguished at all. As the above citation

indicates, strict liability inquiries do tend to focus on the product itself. A design defect

claim focuses upon the specifications for the construction of the product and the risks and

benefits associated with that design. A manufacturing defect claim, however, involves an

examination of the conduct or procedures involved in the manufacturing and construction

of the product. Contrary to the Shreves' argument, a manufacturing defect claim cannot be

established by simply presenting evidence that the product is defective at the time it left the

manufacturer's control. To avoid defendants' motion for summary judgment, plaintiffs must

offer evidence of some indication that the product at issue either was not manufactured in

accordance with the product's design specifications or that during the manufacturing process

the snow thrower was assembled improperly or that some other error occurred. *See*

*Singleton*, 685 F.2d at 114; *Phipps*, 363 A.2d at 959 (A manufacturing error results when

"the defect is a result of an error in the manufacturing process, that is where the product is

in a condition not intended by the seller . . . .").

Courts have provided some idea of what evidence should be presented to establish

a manufacturing defect claim in several cases. In *Eaton Corp. v. Wright*, 375 A.2d 1122

(Md. 1977), for example, an explosion occurred when plaintiff was using a propane torch

and canister. The explosion resulted when the valve of the propane fuel canister failed to

close when the canister was detached from the torch head. The court found, without specific

reliance upon expert testimony, that the product was defective, reasoning that a propane

-51-

torch used within an hour of purchase and in accordance with its directions should not explode. *Id.* at 1127. In particular, the court stated:

> There can be little doubt that a propane canister, used immediately after purchase according to instructions on the label, which continues to allow gas to be released after an appliance has been removed, is defective and unreasonably dangerous. Under circumstances such as these, the plaintiffs presented a prima facie case. There was no necessity for them to show more concerning the precise nature of the defect.

*Id.* (citations omitted).

Though the court did not deem it necessary to determine the precise nature-- design or manufacturing-- of the defect, it did state that "the existence of the defective condition, and its nature, was shown by the testimony of the plaintiffs' expert witness." *Id.* The plaintiff's expert witness did not present evidence that the valve core, manufactured by one of the defendants, was defective in design; rather there was evidence presented that in the manufacturing process, the component parts of the propane torch were not assembled properly. *See id.* at 1125.

Similarly, the Fourth Circuit appeared to reject a plaintiff's manufacturing defect theory because "[the plaintiff] did not provide evidence concerning [defendant's] *method of manufacturing* or its *product specifications* in order to show that the heat pack in question was defective due to nonconformity with the manufacturer's standards." *Koch v. Sports Health Home Care Corp.*, 54 F.3d 773, 1995 WL 290409, at *6 (4th Cir. May 15, 1995) (per curiam)(unpublished)(emphasis added); *see also Elmore v. American Motors Corp.*, 451 P.2d 84, 89 (Cal. 1969) (en banc) (a manufacturing defect was found when expert testimony

torch used within an hour of purchase and in accordance with its directions should not

explode. *Id.* at 1127. In particular, the court stated:

> There can be little doubt that a propane canister, used immediately after
> purchase according to instructions on the label, which continues to allow gas
> to be released after an appliance has been removed, is defective and
> unreasonably dangerous. Under circumstances such as these, the plaintiffs
> presented a prima facie case. There was no necessity for them to show more
> concerning the precise nature of the defect.

*Id.* (citations omitted).

Though the court did not deem it necessary to determine the precise nature-- design

or manufacturing-- of the defect, it did state that "the existence of the defective condition,

and its nature, was shown by the testimony of the plaintiffs' expert witness." *Id.* The

plaintiff's expert witness did not present evidence that the valve core, manufactured by one

of the defendants, was defective in design; rather there was evidence presented that in the

manufacturing process, the component parts of the propane torch were not assembled

properly. *See id.* at 1125.

Similarly, the Fourth Circuit appeared to reject a plaintiff's manufacturing defect

theory because "[the plaintiff] did not provide evidence concerning [defendant's] *method

of manufacturing* or its *product specifications* in order to show that the heat pack in question

was defective due to nonconformity with the manufacturer's standards." *Koch v. Sports

Health Home Care Corp.*, 54 F.3d 773, 1995 WL 290409, at *6 (4th Cir. May 15, 1995) (per

curiam)(unpublished)(emphasis added); *see also Elmore v. American Motors Corp.*, 451

P.2d 84, 89 (Cal. 1969) (en banc) (a manufacturing defect was found when expert testimony

and circumstantial accident scene evidence indicated that the drive shaft of an automobile, driven only 2,751 miles, was improperly connected).

Thus, while the absence of expert testimony may not be fatal in all manufacturing defect claims, it is fatal in the instant case as no circumstantial evidence has been presented to show directly or indirectly that Shreve's snow thrower was not manufactured in accordance with Craftsman's specifications or that there was some error in the assembly of the product. Without expert testimony, Shreve's manufacturing defect claim rests on Shreve's account of the accident. This testimony only supports the conclusion that a product defect may exist; it does not speak to manufacturing processes or product specifications. Further, there is no physical evidence that supports Shreve's testimony such as a broken piece of machinery or a comparison between Shreve's snow thrower and the product design that would show Shreve's snow thrower to be anomalous. Although Shreve's testimony must be accepted as true for the purposes of defendants' motion for summary judgment and thus it is possible to show that there is a product defect, his testimony alone does not raise a genuine issue of material fact to sustain his manufacturing defect claim.[22]

---

[22]Even apart from the *lack* of evidence of a manufacturing defect from the perspective of plaintiffs' claim, plaintiffs' cross motion as to the manufacturing defect claim obviously fails. First, defendants flatly deny that the impeller blade continued to rotate after the auger drive lever was released; the circumstantial evidence that it did not (including but not limited to the lack of any evidence of a similar occurrence and the non-replicability of the occurrence on the Shreves' snow thrower) is sufficient to demonstrate a genuine issue of material fact. Second, defendants' affirmative defense of product misuse also creates a genuine issue of fact as to this claim.

The Shreves argue that "Mr. Shreve's testimony effectively eliminates the other reasonable causes for the impeller continuing to rotate even though the auger drive lever was not

(continued...)

2.    Failure to Warn Claim

The Shreves allege that defendants are liable because they failed to warn him that the impeller blade would continue to rotate even after the auger drive lever was released and that the deflector chute was not adequately guarded to prevent the type of accident that he experienced. Warnings are contained in the Owner's Manual and in decals on the snow thrower. The Owner's Manual for the snow thrower warns in its initial safety rules: "[e]xercise caution to avoid slipping or falling, especially when operating in reverse." The safety rules also specify: "[d]o not put hands or feet near or under rotating parts. Keep clear of the discharge opening at all times." They state: "[s]top the engine (motor) whenever you leave the operating position, before unclogging the auger/impeller housing, or discharge guide, and when making any repairs adjustments or inspections." In addition, they warn users to take "all possible precautions when leaving the snow thrower unattended. Disengage the auger/impeller, shift to neutral, stop engine, and remove key." The safety rules state in different places, "wear footwear that will improve footing on slippery

---

[22](...continued)
depressed." Pls.' Cross Mot. at 14. This argument grievously misapprehends the parties' respective burdens; no reasonable fact finder is compelled to believe Shreve under the circumstances of this case. In this regard, the Shreves make much of a Sixth Circuit case, *Martin v. Joseph Harris Co., Inc.*, 767 F.2d 296 (6th Cir. 1985). In this implied warranty case, farmers brought claims against a seed dealer who sold them cabbage seeds that were infected with a fungus. Defendants informed the plaintiffs that the batch of seed sold to them was infected with the fungus. *Id.* at 298. While defendants challenged the remedy granted by the court, the fact that a defective product was sold was not disputed. The Shreves apparently liken *Martin* to this case in arguing that Shreve's testimony should be accepted as undisputed and uncontroverted. The facts of *Martin* are very different than those presented in here, however; even as to the implied warranty claim, while Shreve's testimony is sufficient if believed to create a genuine issue of material fact, it does not eliminate all factual issues regarding that claim.

surfaces," *id.* and, "[a]lways be sure of your footing, and keep a firm hold on the handles. Walk; never run." Warning labels on the snow thrower itself show a foot near the auger with the words "!Danger  Avoid injury from rotating auger keep hands, feet and clothing away!" and a picture of a hand near the impeller blades in the discharge chute with the words, "! Danger stop the engine before unclogging discharge chute! " *Id.* As a matter of law, these admonitions were adequate.

"Products liability law imposes on a manufacturer a duty to warn if the item produced has an inherent and hidden danger that the producer knows or should know could be a substantial factor in causing an injury." *Virgil*, 484 A.2d at 657 (*citing Moran v. Faberge, Inc.*, 332 A.2d 11 (Md. 1975)); *Owens-Illinois, Inc. v. Zenobia*, 601 A.2d 633, 639 (Md. 1992)(stating that to be held liable for failing to warn, a manufacturer must have "knowledge, or by application of reasonable, developed human skill and foresight should have knowledge, of the presence of the . . . danger"(internal quotation marks omitted) (alteration in original) (quoting Restatement (Second) of Torts § 402A, Comment j)).[23] Such a duty includes risks involved in the intended uses of the product as well as other reasonably foreseeable uses. *Virgil,* 484 A.2d at 657. There must be evidence that the defendant knew or should have known of the danger posed by the product for there to be a duty to warn of

_____

[23]The Court of Appeals of Maryland observed that it had not previously determined whether the knowledge component is an element of the claim to be proven by the plaintiff or whether, instead, the lack of knowledge is to be proven by the defendant as an affirmative defense, *Owens-Illinois, Inc. v. Zenobia*, 601 A.2d. 633, 641 n. 8 (Md. 1992), but it agreed with the lower court that the presence *vel non* of knowledge is a component of the element of "defect" to be proven by the plaintiff. *Id.*

-55-

such danger. *Zenobia,* 601 A.2d at 639. A manufacturer is "held to the knowledge of an expert in the field" and "at a minimum, he must keep abreast of scientific knowledge, discoveries, and advances." *Id.* (internal quotation marks omitted) (citations omitted). "[T]he evidence concerning the presence or absence of knowledge in the expert community is called "'state of the art' evidence."[24] *Id.*

In this case, there is no indication that the defendant had any reason to know of the so-called "impeller blade defect." In fact, no one who has tested Shreve's snow thrower has witnessed this "defect" and no report of a similar malfunction has ever been noted. Without presenting any evidence that defendants knew or should have known about the so-called "impeller blade defect," the Shreves' claim cannot withstand defendants' motion for summary judgment.[25]

Defendants provided a warning on the machine to prevent users from attempting to unclog the deflector chute while the motor of the machine was on. Defendants provided a warning that the motor of the snow thrower should be completely turned off when the

---

[24]  "State of the art" includes:

all of the available knowledge on a subject at a given time, and this includes scientific, medical, engineering, and any other knowledge that may be available. State of the art includes the element of time:  What is known and when was this knowledge available.

*Zenobia*, 601 A.2d at 639 (internal quotation marks omitted) (quoting *Lohrmann v. Pittsburgh Corning Corp.*, 782 F.2d 1156, 1164 (4th Cir. 1986)).

[25]Not even Dr. Shelly suggested that a warning should have been provided as to the so-called "impeller blade defect." Dr. Shelly did allude to the desirability of a reference to such a possibility in the troubleshooting section of the Owner's Manual. *See* September 5, 2000 Report at 16, 21.

operator leaves the snow thrower. The decal on the machine clearly warns against the danger involved in getting any body part or clothing near the blades. Accepting the Shreves' versions of events --that the impeller blades continued to rotate even after the auger drive lever was released-- the most effective warning would be to turn the snow thrower completely off when leaving the operator's position. This warning already appears in the Owner's Manual and on the machine.

Manifestly, the Shreves' claim with respect to the deflector chute is merely a reiteration of the design defect claim, discussed *infra* in Part IV.A.3., rather than a failure to warn claim. Defendants provide a warning to forestall operators from sticking their hands down the deflector chute while the motor of the snow thrower is activated by cautioning against unclogging the chute while the auger blade is activated or while the motor is engaged. In addition, operators are warned about the general danger of coming into contact with the blade. If the accident occurred as Shreve said it did, warning an operator not to place his hand or arm in the deflector chute would have not prevented his injury. There is no suggestion in the summary judgment record to suggest that Shreve would not have attempted to break his fall if such a warning had been pasted to the snow thrower. Further, if defendants were aware that many individuals were injured by having their limbs enter the deflector chute, it would likely be the design that would need adjustment. Plaintiff's claim is that there should have been a guard to prevent a hand or arm from going down the chute. Shreve's expert witness, Dr. Shelley, whose testimony is now excluded, suggested that an

appropriate warning would caution against the danger of losing one's footing near the snow

thrower and making inadvertent contact with the impeller blade; however, "a general

warning of danger suffices, and the manufacturer need not warn of every mishap or source

of injury that the mind can imagine flowing from the product." *Hood v. Ryobi North

America Inc.*, 17 F. Supp. 2d 448, 452-53 (D. Md. 1998) (internal quotation marks omitted)

(quoting *Liesner v. Weslo, Inc.*, 775 F. Supp. 857, 861 (D. Md. 1991)), *aff'd*, 181 F.3d 608

(4th Cir. 1999). In addition, "[o]n the adequacy of warning claim, there is no need for the

warning to specify the nature of the injury to be expected from noncompliance." *Stalnaker

v. General Motors Corp.*, 972 F.Supp. 335, 336 (D.Md. 1996), *aff'd without op.,* 120 F.3d

262 (4th Cir. 1997). Further, the warnings regarding taking care in maintaining secure

footing, wearing appropriate foot wear, and not running near the snow thrower cover the

concerns expressed by Shelley. Accordingly, I shall award defendants summary judgment

on this claim.

        3.    Design Defect Claim

    Plaintiffs allege a design defect claim with respect to the impeller blades, as they

allegedly continued to rotate even long after Shreve had released the auger drive lever.

Defendants concede that summary judgment as to the so-called "impeller blade defect" claim

would not be appropriate. Plaintiffs have met their burden at this stage of the case by

projecting evidence sufficient to enable a reasonable juror to conclude that, if the "dead

man" control malfunctioned as Shreve describes, then the defective "dead man" rendered

the snow thrower "unreasonably dangerous." To be sure, they also contend that the snow thrower is unreasonably dangerous as a matter of law, just as it was clear in *Virgil* that an imploding thermos was unreasonably dangerous as a matter of law. This contention must be rejected. Defendants have generated sufficient evidence regarding the adequacy of the current safety features, the feasibility and effectiveness of adding further safety features, and the hazards that the snow thrower poses (quite apart from the issue of Shreve's credibility as to the manner in which he was injured) to preclude a conclusion that a reasonable juror must, as a matter of law, find the product unreasonably dangerous. Thus, the Shreves have failed to show the absence of a dispute of material (ultimate) fact as to this claim warranting a grant of summary judgment to plaintiffs.

Plaintiffs also assert an "alternative design" claim based on "the lack of a guard or like component such as the Toro M-wire" on the deflector chute. It is true that "in defective design cases involving uncomplicated products or simple design features, the question of the practicability of a proposed design change could be weighed on the basis of inference and common knowledge of the jury" when the proposed changes involved "relatively simple ideas." *Johnson v. Int'l Harvester Co.*, 702 F.2d 492, 496 (4th Cir. 1999). Based on the record here, however, as a matter of law, I am persuaded that the appropriateness of an alternative design of a snow thrower or its discharge chute is not "uncomplicated . . . or simple." *Id.* Accordingly, the absence of expert testimony dooms the alternative design claim.

Design defect cases involve a determination of "whether a manufacturer, knowing the risks inherent in his product, acted reasonably in putting it on the market." *Tannebaum v. Yale Materials Handling Corp.,* 38 F.Supp.2d 425, 431 (D.Md. 1999)(quoting *Pease v. v. American Cyanamid*, 795 F.Supp. 755, 758 n.3 (D.Md. 1992)). The Shreves must show that the snow thrower as presently designed was both "in a defective condition and unreasonably dangerous" when it left the manufacturer. *Ziegler v. Kawasaki Heavy Indus., Ltd.*, 539 A.2d 701, 704 (Md. Ct. Spec. App.), *cert. denied*, 542 A.2d 858 (Md. 1988)). The "absence of a safety device may clearly be a design defect, even in a product which does not 'malfunction.'" *Id.* at 706.

In determining the existence of defective conditions, Maryland courts have applied both the risk/utility test and the consumer expectation theory. *Id.* at 704-07. "The . . . risk/utility theory . . . focuses on whether the benefits of a product outweigh the dangers of the design [while] . . . the consumer expectation theory . . . focuses on what a buyer/user of a product would properly expect that the product would be suited for . . . ." *Castro v. QVC Network, Inc.*, 139 F.3d 114, 116-17 (2nd Cir. 1998)(citations and footnotes omitted). The "plaintiff must produce evidence upon which a jury could determine the manufacturer's reasonableness in marketing the product, and . . . this must amount to more than mere criticism of the existing design." *Johnson*, 702 F.2d at 494.

The risk/utility test applies in the present case to the alleged "deflector chute defect." *Cf. Ziegler*, 539 A.2d at 705 (citing *Phipps*, 363 A.2d 955). Application of the "risk/utility"

test requires analysis of seven factors to determine "whether the product is unreasonably dangerous:"

> (1) The usefulness and desirability of the product--its utility to the user and to the public as a whole; (2) The safety aspects of the product--the likelihood that it will cause injury, and the probable seriousness of the injury it will cause; (3) The availability of a substitute product which would meet the same need and not be as unsafe; (4) The manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility; (5) The user's ability to avoid danger by the exercise of care in the use of the product; (6) The user's anticipated awareness of the dangers inherent in the product and ability to avoid the dangers, because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions; (7) The feasibility, on the part of the manufacturer, of spreading the loss by setting the price of the product or carrying liability insurance.

*Pease,* 795 F.Supp. at 759 (citing *Phipps*, 363 A.2d 955; *Banks v. Iron Hustler Corp.*, 475 A.2d 1243, 1252 n.3 (Md. Ct. Spec. App. 1984); *Sheehan v. Anthony Pools*, 440 A.2dd 1085, 1098 n.6 (Md. Ct. Spec. App. 1982), *aff'd*, 455 A.2d 434, 441 (1983)). Because I have excluded the testimony of plaintiffs' expert, the jury would be without necessary guidance in its application of the multi-factor risk/utility test for determining whether the discharge chute on the Murray snow thrower was unreasonably dangerous. Accordingly, summary judgment shall be granted to the defendants on the alleged "defective discharge chute" claim.

### C.    Maryland Consumer Protection Act Claim

Under the Annotated Code of Maryland, Commercial Law Article, Consumer Protection Act ("CPA"), unfair or deceptive trade practices include false or misleading

representations made to consumers about a product, § 13-301 (1),[26] as well as failures to state a material fact tending to deceive a consumer, § 13-301 (3),[27] and omissions of material facts with the intent that the consumer rely upon them, § 13-301(9)(i).[28] The Shreves argue that they have been victims of unfair and deceptive trade practices because defendants failed:

> 1. to state to Mr. Shreve that when the Snow Thrower was being operated, no adequate guard near or around the chute leading to the impeller blade protected persons from the type of injury that befell Mr. Shreve (i.e., injury as the proximate result of encountering the rotating impeller blade). Amend. Compl. ¶ 108.

> 2. to accurately depict the operation of the impeller blade. Amend. Compl. ¶ 109.

The Shreves also claim that defendants affirmatively misrepresented that "when the Snow

---

[26] Section 13-301(1), unfair or deceptive trade practices, states:
> Unfair or deceptive trade practices include any:
> (1) False, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers . . . .

MD. CODE ANN., COM. LAW II § 13-301(1) (2000).

[27] Section 13-301 (3) states that unfair or deceptive trade practices include "[f]ailure to state a material fact if the failure deceives or tends to deceive." MD. CODE ANN., COM. LAW II § 13-301 (3).

[28] Section 13-301 (9) (i) provides that unfair and deceptive trade practices include:
> Deception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with:
> (i) The promotion or sale of any consumer goods, consumer realty, or consumer service . . . .

MD. CODE ANN., COM. LAW II § 13-301 (9)(i).

Thrower was being operated, and when the auger drive lever was released, the Snow

Thrower would stop throwing snow and the impeller blade would stop rotating." Amend.

Compl. ¶ 111.

> Plaintiffs further claim that

> if each Defendant had represented the true nature of the operation of the Snow
> Thrower (i.e., that the impeller blade would still rotate even after the auger
> drive lever was released), then Mr. Shreve would have conformed his conduct
> so as to not place his hand near the chute deflector when he lost his footing on
> the date and at the time of his injuries.

Amend. Compl. ¶ 113. To make this claim make any sense at all, plaintiffs must argue that

defendants knew of the so-called "impeller blade defect," put the snow thrower on the

market despite this knowledge, and then withheld this information from consumers. Such

a scenario is not remotely supported by the evidence in this case.

Defendants argue that the Shreves provide no evidence that deceptive or unfair trade

practices were used in the sale of the snow thrower or that any such practices caused the

injuries Shreve suffered.[29] The misrepresentations that plaintiffs allege refer to

representations made in the Owner's Manual, which Shreve read *after* he purchased the

snow thrower. Any representations made in the Owner's Manual did not induce (as is

required by §13-301(9)) or deceive Shreve so that he would purchase the machine. Summary

judgment shall be granted to the defendants on this claim because no misrepresentations

---

[29]The Shreves cite *Maillet v. ATF-Davidson Co., Inc.*, 552 N.E.2d 95 (Mass. 1990). The
law of Massachusetts, however, unlike that of Maryland, enumerates failure to perform an
obligation under an implied warranty as a deceptive and unfair trade practice. *Id.* at 100.

were made through statements or omissions and no affirmations or descriptions were provided to Shreve that were made a basis of the bargain.

Rather than addressing whether defendants can be deemed to have misrepresented anything through a statement or omission, the parties have argued over whether subjective or objective reliance is necessary for a CPA claim, and whether the common law claims preempt the CPA. Defendants argue that Shreve was not the victim of deceptive misrepresentation and omissions because he did not converse with anyone when purchasing the show thrower and did not read the snow thrower's owner's manual until after the purchase. Dfs' Sum. Jud. Mot. at 15. Plaintiffs argue that Shreve need not have subjectively relied on any representation to state this claim. They argue that the standard is an objective one and that any misrepresentation is actionable if the misrepresentation is material and if the consumer suffers injury or damage. Pl.'s Cross Mot. at 20. Plaintiffs cite *Green v. H & R Block, Inc.*, 735 A.2d 1039 (Md. 1999) and § 13-302[30] of the CPA for their argument.

*Green v. H & R Block, Inc.*, which involved H & R Block's Refund Anticipation Loan Program (RAL), is inapposite to the instant case. The case involved H & R Block's failure to reveal to its customers that when it arranged for them to take out loans in amounts equivalent to their anticipated tax refund and are secured by that refund, H & R Block benefits financially in various ways through the collection of fees and otherwise. *Id.* at 1044-

---

[30]Section 13-302, deception or damage unnecessary, states that "[a]ny practice prohibited by this title is a violation of this title, whether or not any consumer in fact has been misled, deceived, or damaged as a result of that practice." MD. CODE ANN., COM. LAW II § 13-302.

45. One of the central issues was whether the information H & R Block omitted would have been material to consumers. The court commented that in most cases such a determination is a question for the jury, but that in some situations, it can be determined as a matter of law. *Id.* at 1059. There is no question that H & R Block was aware of the multiple ways in which it profited from the RAL program and that it did not inform customers of that benefit.

In the instant case, it is not difficult to conclude that information that a product is defective certainly would be material to a consumer, regardless of whether a subjective or objective measure is used. But that it is material does nothing to further the Shreves' CPA claim because there is no indication whatsoever that defendants knew of any defect and covered up its existence through sales practices or materials. Shreve bought the snow thrower with the expectation that it would work properly and safely. If it did not work in that fashion then the avenue for redress may be the implied warranty of merchantability. *See infra* pp. 72-73. It is not that this common law claim "preempts" the CPA claim; rather, it is that Shreve can only claim the implied warranty claim on the facts of this case. *Cf. Sacks v. Philip Morris Inc.*, No. WMN-95-1840, 1996 U.S. Dist. 15184, at *5-6 (D. Md. Sept. 19, 1996) (unpublished) (stating that "producing a defectively designed product, however, is not a violation of the [Maryland Consumer Protection Act (MCPA)] and that "if the Court were to accept Plaintiffs' theory, every product liability claim could also be converted into a claim under the MCPA").

Plaintiffs seek comfort in CPA cases that involved the residential rental industry.

These cases do not support the Shreves' position that they have a CPA claim because they are not analogous to the circumstances here. Specifically, under state and federal law, individuals who offer for lease residential real property have certain duties, such as insuring that the proper licensing and safety requirements are met. CPA claims in the rental housing context still require a showing that the defendant had knowledge of a defect or violation and then failed to disclose or misrepresented that fact to the plaintiff. *See Hayes v. Hambruch*, 841 F.Supp. 706, 713 (D.Md. 1994)("[B]oth statutory law in Maryland and Maryland common law have imposed liability on a landlord for a defect in the premises only upon a showing of the landlord's knowledge of that defect."), *aff'd without op.*, 64 F.3d 657 (4th Cir. 1995). The settled body of law surrounding landlord-tenant relationships, however, particularly when its application is informed by important public policy considerations, permits (and indeed compels) that certain knowledge be imputed to the landlord. Thus, in *Golt v. Phillips*, 517 A.2d 328 (Md. 1986), the landlord was held liable under the CPA for failing to disclose to the tenant that the dwelling was not properly licensed even though he claims he did not know of this omission. *Id.* at 332. ("Ignorance of the law, however, is no defense. A landlord must be held to be aware of all laws concerning the validity of leasing its premises.") The court reasoned that the landlord should have known that the premises were not properly licensed and that by advertising the premises he was misleading consumers because without the proper licensing the landlord was not authorized to lease the dwelling at all. *Id.* This knowledge was imputed to the landlord, and its omission was

deemed deceptive under the CPA. *Id.* The instant case shares none of the relevant characteristics of *Golt*.

The parties also argue over the meaning of *Benik v. Hatcher*, 750 A.2d 10 (Md. 2000). *Benik* reiterates the rule that proof of defendants' knowledge is necessary to maintain a CPA claim, but that certain knowledge will be imputed to a landlord. The Baltimore Housing Code requires that rental property be delivered in a safe and habitable condition and expressly states that flaking, loose, or peeling paint must be removed. *Id.* at 17-18. An apartment cannot be leased unless it meets the dictates of the housing code. A "landlord [is] presumed to know the requirements of the City Code pertaining to the habitability of leased premises." *Id.* at 24. When a landlord and tenant enter into a lease, it is assumed that the landlord has complied with the Housing Code and warrants the property in accordance with the Code's requirements. *Id.* at 23. Knowledge of the condition of the premises is imputed to the landlord because of the warranty that is extended to the tenant. In *Benik*, there was evidence from which the jury could have concluded that the paint was chipping and flaking when the tenants moved in and thus the knowledge is imputed to the landlord and his failure to disclose it was deemed a violation of the CPA. *Id.* at 25. The court concluded that "[w]e determine that the landlord who leases premises for human habitation is presumed to have knowledge of any defective condition that a reasonable inspection would have disclosed . . . ." *Id.* at 26.

In the instant case, there is no legal or logical theory by which knowledge of the

alleged "impeller blade defect" can be imputed to defendants. The implied warranty of

merchantability has not been deemed to operate like the implied warranty of habitability,

which has been enumerated in great detail by state law. Similarly, the nature of the defect

alleged by the Shreves is one that would not be found by reasonable inspection. While the

so-called "deflector chute defect" presents a slightly different case, there is still no indication

that defendants misrepresented the operation of the deflector chute or the danger posed by

the impeller blades. Accordingly, defendants shall be granted summary judgment on the

CPA claim.

      D.     Breach of Warranty Claims

          1.     Express Warranty Claim

Under Maryland law express warranties are created by:

(a)    Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation.

(b)    Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

(c)    Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

MD. CODE ANN., COM. LAW I § 2-313 (1) (1997). The plaintiff must show that the product

did not conform to the warranty and that the lack of conformity proximately caused the

injury suffered. *Reed v. Sears, Roebuck & Co.*, 934 F. Supp. 713, 719 (D.Md. 1996); *Lowe*

*v. Sporicidin Int'l*, 47 F.3d 124, 132 (4th Cir. 1995).

Shreve testified that no one at Sears made any representations about how the snow thrower worked or about any of the qualities of the snow thrower. Shreve Dep. at 16. Rather, the Shreves argue that defendants created an express warranty by stating in the Owner's Manual that when the auger drive lever was released the impeller blade would stop rotating and that the machine was reasonably safe for its intended use. The representation upon which Shreve bases this claim is found in the section of the Owner's Manual, entitled "How to Use Your Snow Thrower." It states that to throw snow "push down on the auger drive lever," and "release [the auger drive lever] to stop throwing snow." Owner's Manual at 10. This description of how to operate the snow thrower does not constitute an express warranty. While Shreve obviously bought the snow thrower expecting that it would work appropriately and safely for its intended purposes, it cannot be said that the representations made in the Owner's Manual constitute affirmations about the product that became the basis of the bargain that Shreve entered into with the defendants when he purchased the snow thrower. It is more sensible to regard  his expectation that the snow thrower would work appropriately, including his expectation that the impeller and auger blades would cease rotating when the auger drive lever was released, a part of the implied warranty of merchantability.

The cases cited by plaintiffs do not support the contention that the Owner's Manual provided any express warranties. For example, in *McCarty v. E.J. Korvette, Inc.*, 347 A.2d 253, 256 (Md. 1975), an express warranty was found in a representation made on the back

of the invoice of the sale, which purportedly was read prior to the sale being finalized. The representation was entitled "All-Road Hazards Tire Guarantee," and it enumerated the conditions under which the tires sold would be repaired or replaced by the seller and for what length of time. *Id*. This representation as to the quality of the tires sold and the conditions under which repairs would be made by the seller was clearly made a part of the bargain into which the buyer and seller entered into and was agreed upon prior to finalizing the sale.

Similarly, in *Int'l Motors, Inc. v. Ford Motor Co., Inc.*, 754 A.2d 1115 (Md.Ct.Spec.App. 2000), *rev'd on other grounds*, *General Accident Ins. Co.*, __ A.2d __, 2001 WL 1029363, the express warranty was a "bumper to bumper" warranty that detailed the conditions under which the seller would repair or replace parts. *Id*. at 1116. The representations made in the "bumper to bumper" warranty were communicated to the consumer upon the purchase of the truck and thus became a basis of the bargain. Such a scenario is not present in the instant case. Shreve read the Owner's Manual after he had made the purchase and returned home. While Shreve testified that "[a]t the time of the purchase of the Snow Thrower, I believed that all the facts and other representations in the documents accompanying the sale of the Snow Thrower were accurate," Shreve Affidavit ¶ 3, it is unclear how he could have read and relied on those representations prior to the purchase; they were not printed on the snow thrower container or made through a demonstration or sample. In fact, the representations made in the Owner's Manual merely

elaborate upon the implied warranty of merchantability by detailing how the snow thrower works and how it should be operated and maintained so that it will continue in a "merchantable" condition.

Plaintiffs cite *Sharrard, McGee & Co. v. Suz's Software, Inc.*, 396 S.E.2d 815 (N.C.Ct. App. 1990), for the proposition that an instruction manual that accompanied a computer sale became part of the basis of the bargain and constituted an express warranty. Pl.'s Cross Mot. at 35. Plaintiffs misapprehend the facts of this case, however. In *Sharrard*, the seller wrote a letter to the prospective buyer prior to the purchase which stated "[w]e guarantee our programming with full return and refund privileges for the software and printer should our programming not perform as warranted." *Sharrard, McGee & Co.*, 396 S.E.2d at 818. An instruction manual was given to the prospective buyers that contained warranties regarding particular functions that the software could perform, supplementing the warranties expressed in the letter. *Id.* This manual was given to the buyer prior to the installation and full payment of the system. *Id.* The court found that these warranties induced the buyer to go through with the transaction. *Id.* Thus, while *Sharrard, McGee & Co.* presents a case in which an instruction manual contained affirmations that did constitute an express warranty, the facts surrounding the transaction are quite different than those surrounding Shreve's purchase of the snow thrower.

The Owner's Manual that Shreve received was not viewed prior to his purchasing the snow thrower, nor did it contain any affirmations that supplemented another promise made

to him prior to, and with the hope or expectation of, inducing him to complete the sale. Accordingly, summary judgment shall be granted to the defendants on this claim as no express warranty was made to Shreve and, if there was, there is no showing that the a breach of the express warranty was a proximate cause of his injury.

2.    Implied Warranty of Merchantability Claim

For the implied warranty of merchantability claim, a plaintiff must show that the product was not fit for its intended purpose. MD. CODE ANN., COM. LAW I § 2-314 (c) (1997); *General Accident Ins. Co.*, __ A.2d __, 2001 WL 1029363, at * 6. A warranty of merchantability is implied in the contract of sale when the seller of goods is a merchant with respect to goods of that kind. *See Virgil*, 484 A.2d at 655; MD. CODE ANN., COM. LAW I § 2-314 ("Unless excluded or modified, a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind."). "To be merchantable, the goods must at least be fit for the ordinary purposes for which they are sold and conform to any promises or affirmations of fact made on the container or label." MD. CODE ANN., COM. LAW I § 2-314 (f). Proof of defect, attribution of the defect to the seller, and a causal relation between the defect and injury are necessary for this claim,  just as they are for strict liability claims, *supra* p. 42. *General Accident Ins. Co.*, __ A.2d __, 2001 WL 1029363, at * 6; *Miskin v. Baxter Healthcare Corp.*, 107 F. Supp. 2d 669, 672 (D.Md. 1999), *aff'd without op.*, 213 F.3d 632 (4th Cir. 2000).

Viewing the facts in the light most favorable to plaintiffs, the auger and impeller

-72-

blades continued to rotate even though they should have ceased when the auger drive lever

was released. They allege that this defect was responsible for their injuries, and for the

purposes of summary judgment, this allegation is sufficient. As was the case with the design

defect issue, *supra* pp. 58-61, expert testimony to support plaintiffs' claim is unnecessary.

Defendants have not demonstrated the absence of a genuine issue of material fact as to the

question of the existence of this defect; if the jury believes Shreve's account of the accident,

it might reasonably conclude that the snow thrower contained a defect and operated in a

manner in which it was not intended. *See, e.g., Bond v. NIBCO, Inc.*, 623 A.2d 731, 738

(Md. Ct. Spec. App. 1993)(defendant did not present evidence to demonstrate that no

genuine issue of fact existed as to the purported defective nature of the faucets sold to the

plaintiff). Defendants' motion for summary judgment shall be denied as to this claim.

    E.    Loss of Consortium

    The Shreves moved for summary judgment on this derivative claim. The success of

this claim depends on the success of the Shreves' other claims.[31] Because plaintiffs are not

entitled to summary judgment on any of their other claims, an award of summary judgment

on the loss of consortium claim cannot be granted.

V.    MOTION TO AMEND AND RELATED MOTIONS

    There remains for consideration plaintiffs' motion to file a second amended

---

[31]"In Maryland, loss of consortium is a joint claim for loss of society, affection, assistance
and conjugal fellowship. *Deems v. Western Maryland Ry. Co.*, 231 A.2d 514 (Md. 1967)."
*Newborn v. Newborn*, 754 A.2d 476, 491 n.12 (Md.Ct.Spec.App. 2000).

-73-

complaint and several related and unrelated discovery motions. Those motions shall be denied for the following reasons.

According to plaintiffs, on the eve of the close of expert discovery, on or about December 7, 2000, as a result of additional work performed by their expert, they learned for the first time that some manufacturers and retail sellers of snow throwers market "certain two-stage snow throwers contain[ing] wires in the shape of an "m" or "w" guarding the opening above the impeller." Pls.' Mot. Extend Disc. at 3. Thus, according to plaintiffs, as of the close of discovery, there existed a heretofore unknown basis for a contention by plaintiffs that the absence of such a device on the snow thrower involved in this case rendered the snow thrower defective for an additional reason. Furthermore, according to plaintiffs, allegedly because defendants recklessly failed to employ the "m wire" device or some similar device as an additional safety feature, there existed a legitimate basis on which to assert a claim for punitive damages under Maryland products liability law. These contentions are factually and legally unsupportable.

In the first place, the record discloses that plaintiffs had not been diligent in pursuing all of the information relevant to their claims. Plaintiffs' own expert admitted that "in the back of [his] mind, [he] knew about" the alternative "m wire" design, even at the time he was first engaged in connection with this case and when he prepared and submitted his original expert report. Furthermore, the existence of the "m wire" design has been generally well known for almost 40 years (and indeed, it has been discussed in at least three reported

cases). *See Haynes v. Ariens Co.*, 462 N.E.2d 273, 275 (Mass. 1984) ("The plaintiffs, through an expert, introduced evidence that the defendant's failure to design the snowblower with a 'deadman's clutch' or an 'M wire,' both of which were economically and technologically feasible at the time of manufacture [i.e., 1961], did not meet design standards accepted by the industry when the machine was manufactured."), *abrogated on other grounds*, *Vassallo v. Baxter Healthcare Corp.*, 696 N.E.2d 909(1998); *Lewis v. Ariens Co.*, 729 N.E. 2d 323, 307 n.11 (Mass. App. 2000), *overruled in part on other grounds*, 751 N.E.2d 862 (Mass. 2001); *Bottignoli v. Ariens Co.*, 560 A.2d 1261, 1263 (N.J.Sup. 1989)("M guards were not used on snowblowers until 1967."). Remarkably, in fact, by their own admission, plaintiffs actually *abandoned* an allegation, made in their original complaint, that "the failure to place an adequate protective guard" on the discharge chute rendered the snow thrower defective, when they filed their first amended complaint. *See* Pls.' Mem. Supp. Mot. Leave to File Second Amend. Compl. at 18. Plaintiffs' contention that a "flared chute" is "conceptually indistinguishable" from an "m wire," *id.*, is, to put it charitably, disingenuous.

Thus, it is clear that plaintiffs failed to demonstrate "good cause" for any modification of the scheduling order to permit the belated amendment of the amended complaint to include *a claim which had been abandoned* or to permit further discovery. I fully recognize that the liberal policy underlying Fed. R. Civ. P. 15 militates heavily in favor of allowing amendments to pleadings under most circumstances. *See Elmore v. Corcoran*,

913 F.2d 170, 172 (4th Cir. 1990). Nevertheless, undue delay "accompanied by futility or prejudice to the non-movant" is "a sufficient reason" for denying leave to amend under Rule 15(a). *HealthSouth Rehab. Hosp. v. Am. Nat'l Red Cross*, 101 F.3d 1005, 1010 (4th Cir. 1996). There can be no question that plaintiffs have failed to act with appropriate diligence; their purported explanation for the delay is factually unsupportable. Moreover, there is no question that defendants will be prejudiced by the proposed amendment; they will be required to undertake a renewed and broad scope of additional discovery to meet a contention as to the desirability of the "m wire" design, particularly if, as plaintiffs now insist, the defendants' knowledge of the existence of the "m wire" design supports a punitive damages claim.[32] For these reasons, the motion to amend and the related motions shall be denied.[33]

---

[32]In any event, however, I agree with defendants that, as a matter of law, plaintiffs' proffer that defendants had knowledge of, but elected not to employ, the "m wire" design, would not support a punitive damages claim under Maryland law. *See Zenobia*, 601 A.2d. at 652-59; *cf. Robinson v. Cutchin*, 140 F.Supp.2d 488, 495 (D.Md. 2001). Accordingly, an additional ground for denying the motion to amend is that the insertion into the case of punitive damages claims would be futile. *See HealthSouth Rehab. Hosp. v. Am. Nat'l Red Cross*, 101 F.3d 1005, 1010 (4th Cir. 1996). Similarly, inasmuch as Dr. Shelly's testimony has been excluded, the jury would be left to its own devices in evaluating the "m wire" alternative design.

[33]I have also reviewed carefully plaintiffs' motions to compel. While plaintiffs are not to be criticized for undertaking aggressive and broad-based discovery in a case of this sort, I am satisfied that the motions to compel should be denied. Defendants' supplemental responses to plaintiffs' requests for admission are appropriate, given the convoluted and argumentative wording of the requests. Furthermore, in light of the limited role of expert testimony (if any) in this case, I agree with the defendants that the expansive document requests served by plaintiffs are burdensome and unwarranted.

VI.    CONCLUSION

For the reasons set forth herein, I am persuaded that despite his impressive credentials, Dr. Joseph Shelly's education, experience and training as a mechanical engineer do not qualify him as an expert under the circumstances of this case. Moreover, I am persuaded that proper application of the criteria for assessment of the reliability of specialized knowledge opinion testimony under Fed. R. Evid. 702 compels the exclusion of Dr. Shelly's opinion testimony. On the merits of the cross-motions for summary judgment, I am satisfied that under the unique circumstances of this case, a lay jury could reasonably conclude without the aid of expert testimony that the snow thrower purchased by Shreve was defective and unreasonably dangerous (and that it malfunctioned) and that the defect (or malfunction) proximately caused his injuries. On the other hand, no jury would be required so to find, or even to believe Shreve's account of the manner in which he was injured. Accordingly, defendants' motion for summary judgment shall be granted in part and denied in part and plaintiffs' motion for summary judgment shall be denied. Finally, I am persuaded that plaintiffs' lack of diligence in seeking leave to file a second amended complaint is inexcusable, and that allowance of the amendment would be prejudicial to defendants and, in any event, futile in significant part. An Order reflecting the determinations made herein follows.

Filed: September 25, 2001

ANDRÉ M. DAVIS
United States District Judge

-77-